No. 23-1262

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

**UNITED STATES OF AMERICA,**
*Plaintiff-Appellee*

v.

**JI CHAOQUN,**
*Defendant-Appellant*

---

Appeal from the United States District Court
For the Northern District of Illinois, Case No. 18 CR 611
Judge Ronald A. Guzman

_____

**BRIEF OF APPELLANT JI CHAOQUN**

_____

Damon M. Cheronis
**Cheronis, Parente & Levitt**
140 S. Dearborn St., Suite 404
Chicago, Illinois 60603
Telephone: (312) 663-4644
damon@cheronislaw.com

Ryan J. Levitt
**Cheronis, Parente & Levitt**
140 S. Dearborn St., Suite 404
Chicago, Illinois 60603
Telephone: (312) 663-4644
ryan@cheronislaw.com

_____

**Attorneys for Defendant-Appellant**

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Court of Appeals Number: 22-1691

Short Caption: United States v. Ji Chaoqun

Full name of every party represented:  Ji Chaoqun

Name of law firms and lawyers that appeared for the party:

**Cheronis, Parente & Levitt**
Damon M. Cheronis
Ryan J. Levitt
Christopher Parente

**Ropes & Gray**
Laura G. Hoey

Attorney's name and printed address:

Damon M. Cheronis
Ryan J. Levitt
**Cheronis, Parente & Levitt**
140 South Dearborn Street, Suite 404
Chicago, Illinois 60603
Telephone: (312) 663-4644
Fascimile: (312) 277-1920
Email:  damon@cheronislaw.com; ryan@cheronislaw.com

Laura G. Hoey
**Ropes & Gray**
191 N. Upper Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 845-1318
Laura.Hoey@ropesgray.com

Respectfully Submitted,

/s/Ryan J. Levitt
**Ryan J. Levitt,**
One of the attorneys for Defendant-Appellant

## TABLE OF CONTENTS

Table of Authorities ....................................................................................v-x

Jurisdictional Statement ...............................................................................1

Issues Presented for Review ...................................................................... 1-2

Statement of the Case............................................................................... 3-9

Summary of the Argument....................................................................... 9-12

Argument ............................................................................................. 13-47

    I.     The Government Constructively Amended the Indictment.............. 13-18

        A. Additional Relevant Background ............................................. 13-14

        i. Disclosure of New Qualifying "Acts" .......................................... 13

        ii. Trial Evidence, Arguments, and Instructions ......................... 13-14

        B. Legal Standard .......................................................................... 14

        C. The Government Constructively Amended the Indictment ................. 15-18

    II.    The District Court Erred in Denying
        the Motion to Dismiss Count Two................................................... 18-25

        A. Judge Trenga's Opinion ......................................................... 18-19

        B. The Fourth Circuit's Opinion................................................. 19-22

        C. Additional Considerations ..................................................... 23-25

    III.    The District Court Erred in Deciding the Merits of the
        Legal Commercial Transaction Defense ........................................... 25-29

        A. Legal Standard .......................................................................... 25

        B. Discussion............................................................................. 25-9

        i. 18 U.S.C. § 951(d) is Not Limited by a
        Narrowing Agency Meta-Exception ........................................ 25-28

      ii.  The Affirmative Defense was Improperly Barred
Based Upon The District Court's Factual Acceptance
of the Government's Contested Proffer .................................................. 28-29

IV.    **The District Court Abused its Discretion in Denying the Motion
to Suppress Statements Made to the Undercover Agent Without
Holding an Evidentiary Hearing** ...................................................... 30-35

     A.  Legal Standard ......................................................................... 30-31

     B.  Ji's Statements Were Involuntary .............................................. 31-32

     C.  The District Court Erred in Denying the Motion
Without Holding an Evidentiary Hearing ................................. 32-36

V.    **The District Court Erred in Barring the Defense from Introducing
The Expert Testimony of Donald Clarke** ......................................... 36-39

     A.  Legal Standard ......................................................................... 36-37

     B.  Professor Clarke's Proffered Opinions ...................................... 37-38

     C.  Professor Clarke's Testimony Satisfied Rule 702 and Should
Have Been Admitted ................................................................ 38-39

     D.  In the Alternative, the District Court Erred by Not Instructing
The Jury as to the Relevant Provisions of PRC Law ................... 40

VI.    **The District Court Erred by Refusing a Unanimity Instruction
Regarding the Elements for § 951** .................................................... 40-41

VII.    **The District Court's Sentence of 96 Months' Imprisonment
Was Plainly Unreasonable** .............................................................. 42-47

**Conclusion** ................................................................................................ 48

## TABLE OF AUTHORITIES

**Cases**

*Abramski v. United States*, 134 S.Ct. 2259 (2014)
................................................................................................ 24

*Bostock v. Clayton Cty.*, 140 S.Ct. 1731 (2020)
.............................................................................................26, 28

*Burrage v. United States*, 134 S.Ct. 881 (2014)
................................................................................................ 24

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)
............................................................................................36, 37

*Ex Parte Bain*, 121 U.S. 1 (1887)
................................................................................................ 14

*Gall v. United States*, 552 U.S. 38 (2007)
................................................................................................ 43

*Gastineau v. Wright*, 592 F.3d 747 (7th Cir. 2010)
................................................................................................ 30

*Jinro Am. Inc. v. Secure Investments, Inc.*, 266 F.3d 993 (9th Cir. 2001)
................................................................................................ 36

*Johnson v. Louisiana*, 406 U.S. 356 (1972)
................................................................................................ 40

*Lindahl v. Office of Personnel Mgmt.*, 470 U.S. 768 (1985)
................................................................................................ 22

*McKelvey v. United States*, 260 U.S. 353 (1922)
................................................................................................ 19

*Richardson v. United States*, 526 U.S. 813 (1999)
................................................................................................ 40

*Russell v. United States*, 369 U.S. 749 (1962)
................................................................................................ 14

*Schad v. Arizona*, 501 U.S. 624 (1991)

.......................................................................................................... 40

*Sierra Club v. Jackson*, 833 F. Supp. 2d 11 (D.C. Cir. 2012)
.......................................................................................................... 27

*Smego v. Payne*, 854 F.3d 387 (7th Cir. 2017)
.......................................................................................................... 30

*Smith v. United States*, 568 U.S. 106 (2013)
.......................................................................................................... 19

*Stirone v. United States*, 361 U.S. 212 (1960)
.......................................................................................... 14, 16-18

*United States v. Abouammo*, 19 CR 621 (N.D. Cal. 2022)
.......................................................................................................... 41

*United States v. Arberry*, 612 F.3d 898 (7th Cir. 2010)
.......................................................................................................... 42

*United States v. Backlund*, 689 F.3d 986 (9th Cir. 2012)
.......................................................................................................... 26

*United States v. Bass*, 404 U.S. 336 (1971)
.......................................................................................................... 24

*United States v. Becerra*, 992 F.2d 960 (9th Cir. 1993)
.......................................................................................................... 25

*United States v. Chi Mak*, 05 CR 293 (C.D. Cal. 2007)
.......................................................................................................... 41

*United States v. Cook*, 84 U.S. 168 (1872)
.......................................................................................................... 19, 22

*United States v. Cunningham*, 429 F.3d 673 (7th Cir. 2005)
.......................................................................................................... 42, 43

*United States v. Dean*, 414 F.3d 725 (7th Cir. 2005)
.......................................................................................................... 43

*United States v. Deleveaux*, 205 F.3d 1292 (11th Cir. 2000)
.......................................................................................................... 21

*United States v. DiSantis*, 565 F.3d 354 (7th Cir. 2009)
.................................................................................................. 40

*United States v. Dobek*, 789 F.3d 698 (7th Cir. 2015)
.................................................................................................. 35

*United States v. Dumeisi*, 03 CR 664 (N.D. Ill. 2003)
.................................................................................................. 39

*United States v. Edgeworth*, 889 F.3d 350 (7th Cir. 2018)
.................................................................................................. 30

*United States v. Garcia–Oliveros*, 639 F.3d 380 (7th Cir. 2011)
.................................................................................................. 43

*United States v. Gardner*, 840 Fed. Appx. 6 (7th Cir. 2021)
.................................................................................................. 37

*United States v. Gonzales*, 121 F.3d 928 (5th Cir. 1997)
.................................................................................................. 21

*United States v. Gurolla*, 333 F.3d 944 (9th Cir. 2003)
.................................................................................................. 25

*United States v. Haddon*, 927 F.2d 942 (7th Cir. 1991)
.................................................................................................. 30

*United States v. Hooker*, 841 F.2d 1225 (4th Cir. 1988)
.................................................................................................. 19

*United States v. Johnson*, 981 F.3d 1171 (11th Cir. 2020)
.................................................................................................. 21

*United States v Khomutov*, 2020 WL 1304834 (N.D. Ill. 2020)
.................................................................................................. 30

*United States v. Kuna*, 760 F.2d 813 (7th Cir. 1985)
.................................................................................................. 15

*United States v. Lanier*, 520 U.S. 259 (1967)
.................................................................................................. 24

*United States v. Latchin*, 04 CR 661 (N.D. Ill. 2004)
.................................................................................................. 41

*United States v. Lawal*, 231 F.3d 1045 (7th Cir 2000)
.......................................................................................... 33-35

*United States v. Liechtman*, 948 F.2d 370 (7th Cir. 1991)
.......................................................................................... 15

*United States v. Locklear*, 829 F.2d 1314 (4th Cir. 1987)
.......................................................................................... 30

*United States v. Lyons*, 733 F.3d 777 (7th Cir. 2013)
.......................................................................................... 42

*United States v. Mayfield*, 771 F.3d 417  (7th Cir. 2019)
.......................................................................................... 25

*United States v. McArthur*, 104 F.3d 1350 (11th Cir. 1997)
.......................................................................................... 21

*United States v. Oliver*, 142 F. Supp. 2d 1047 (N.D. Ill. 2001)
.......................................................................................... 30

*United States v. Plowman*, 700 F.3d 1052 (7th Cir. 2012)
.......................................................................................... 25, 26

*United States v. Preston*, 751 F.3d 1008 (9th Cir. 2014)
.......................................................................................... 30

*United States v. Rafiekian*, 2019 WL 3021769 (E.D. Va. 2019)
.......................................................................................... passim

*United States v. Rafiekian*, 991 F.3d 529 (4th Cir. 2021)
.......................................................................................... passim

*United States v. Reed*, 859 F.3d 468 (7th Cir. 2017)
.......................................................................................... 42

*United States v. Rodriguez–Alvarez*, 425 F.3d 1041 (7th Cir. 2005)
.......................................................................................... 42

*United States v. Royal*, 731 F.3d 333 (4th Cir. 2013)
.......................................................................................... 19-21

*United States v. Rutherford*, 555 F.3d 190 (6th Cir. 2009)

............................................................................................................30

*United States v. Salvanki*, 458 Fed. Appx. 559 (7th Cir. 2012)
................................................................................................43

*United States v. Santiago-Godinez*, 12 F.3d 722 (7th Cir. 1993)
................................................................................................26

*United States v. Shafi*, 252 F. Supp. 3d 787 (N.D. Cal. 2017)
................................................................................................23

*United States v. Shoffner*, 942 F.3d 818 (7th Cir. 2019)
................................................................................................42

*United States v. Thompson*, 554 F.3d 450 (4th Cir. 2009)
................................................................................................19

*United States v. Tokash*, 282 F.3d 962 (7th Cir. 2002)
................................................................................................25

*United States v. Vasquez-Abarca*, 946 F.3d 990 (7th Cir. 2020)
................................................................................................43

*United States v. Villafuerte*, 502 F.3d 204 (2d Cir. 2007)
................................................................................................42

**Statutes**

18 U.S.C. § 371
............................................................................................1, 3, 9

18 U.S.C. § 951
....................................................................................Passim

18 U.S.C. § 1001
................................................................................................3

18 U.S.C. § 1343
................................................................................................3

18 U.S.C. § 3231
................................................................................................1

18 U.S.C. § 3553

................................................................................................42, 45, 46

18 U.S.C. § 3742

................................................................................................42, 47

28 U.S.C. § 1291

................................................................................................ 1

**Rules**

Fed. R. Crim. P. 29

................................................................................................ 13

Fed. R. Evid. 702

................................................................................................36-37

**Legislative History**

Pub. L. No. 99-569, Title VII § 703 (Oct. 27, 1986)

................................................................................................ 28

Pub. L. No. 103-199, Title II § 202 (Dec. 17, 1993)

................................................................................................ 28

**Other Authority**

U.S.S.G. § 2M3.3

................................................................................................ 46

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231. The appeal is from a judgment of conviction that disposed of all claims. Ji Chaoqun's motion for a new trial or judgment of acquittal was filed on October 10, 2022, and denied on January 5, 2023. The district court entered an amended judgment on February 3, 2023. The notice of appeal was timely filed on February 10, 2023. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

Ji Chaoqun ("Ji") came to the United States on August 28, 2013 in order to pursue a master's degree in electrical engineering at the Illinois Institute of Technology. When he left China, Ji had no agreement to act as a foreign agent with the People's Republic of China ("PRC") or any of its officials. He came to America for purely personal reasons, and any overtures that may have been made by the PRC in the leadup to his departure were not accepted. During the following years, whether during return visits home or at any other relevant time, whatever flirtations Ji may have been prone to and/or considered in his youth, he never acted as an unregistered foreign agent as proscribed by 18 U.S.C. § 951. This was supported by the trial evidence in that even after the alleged intelligence officers revealed their true identity and intentions to Ji, he took no actions and barely maintained contact with them.

Ji was acquitted of the wire fraud counts, and convicted of the § 371 conspiracy charge to violate § 951, the substantive § 951 count, and the related false statement charge.

Those convictions, however, would never have been possible but for the significant and pervasive errors that occurred in the district court. The issues on appeal are therefore:

1.      Whether count two (18 U.S.C. § 951) was constructively amended by the government's reliance on qualifying actions that were not put before the grand jury or alleged in the superseding indictment.

2.      Whether Subsection (d)(4) of § 951, exempting "any person engaged in a legal commercial transaction" from the definition of "foreign agent," creates an element of the offense or affirmative defense.

3.      Whether the district court erred in deciding the merits of the legal commercial transaction defense and barring its presentation.

4.      Whether the district court abused its discretion in denying the motion to suppress statements made to an undercover agent without first holding an evidentiary hearing.

5.      Whether the district court erred in barring expert testimony necessary to explain the law and functioning of the PRC state as it pertained to the statements elicited in the course of a government ruse, given that an FBI agent approached Ji while posing as a Chinese intelligence operative sent to investigate his culpability for the arrest of Ji's "handler," an alleged high-ranking MSS officer, and no Chinese citizen could reasonably refuse such a request.

6.      Whether the district court erred in failing to appropriately instruct the jury on the concept of unanimity as to the acting element for count two (18 U.S.C. § 951).

7.     Whether the sentence of 96 months' imprisonment was plainly unreasonable.

<u>STATEMENT OF THE CASE</u>

On May 19, 2022, the grand jury returned a five count superseding indictment charging Ji with one count of an "offense clause" conspiracy in violation of 18 U.S.C. § 371, one count of acting in the United States as a foreign agent without providing prior notification to the Attorney General in violation of 18 U.S.C. § 951(a), two counts of wire fraud in violation of 18 U.S.C. § 1343, and one count of making a false statement in violation of 18 U.S.C. § 1001(a)(2). Dkt. # 283.

The relevant facts begin in January of 2013 when Ji was 21-years-old and finishing up his undergraduate studies in China. There was a small career fair at his college, which was attended by a professor from another university who was recruiting students. GE 2103 00:17:57. Ji attended this fair and had some limited contact with the professor. *Id.* His name was Zha Rong, the reported Division Director of the Jiangsu Province State Security Department ("JSSD") of the MSS[1], and also Xu Yanjun's boss.[2] Tr. 215. At times he held himself out as a professor, and his business card claiming to be a professor was introduced by the defense. Tr. 214; Exhibit Hull Cross 2. Critically, Ji was not initially informed that Zha was recruiting for the MSS (*see* GE 2103 00:17:57), and it remained a point of

---

[1] The MSS, or Ministry of State Security, is the intelligence and security agency for the PRC. *See* Dkt. # 283 ¶ 1(c).

[2] Xu Yanjun was alleged to have been a Section Chief within the MSS's Sixth Bureau of the JSSD from 2010 to May 2015, and Deputy Division Director from that point forward. In April of 2018 he was lured into Belgium and arrested by American and international authorities for charges related to efforts to recruit a Chinese-American GE employee that was separate and apart from the allegations in this case. From December 2013 forward he was alleged to have effectively become Ji's "handler."

contention as to when Ji actually learned about Zha and others' alleged affiliations, whether he eventually knowingly joined them, and just as importantly, whether he agreed to and so acted on their behalf.

The narrative thread that wove together the timeline of the trial consisted of numerous text messages obtained by the government during its investigation. Those were primarily presented through a summary chart, Exhibit 2600. The messages showed Ji eventually coming into contact with another alleged intelligence officer by August of 2013, Geng Zhengjun. *Id.* p. 1. As Ji was preparing to come to the United States, Geng was Ji's primary point of contact, and that remained the case up until the following winter. *Id.* The messages show that it was always Geng who initiated contact with Ji, cajoling him, flattering him, but never revealing his hidden intentions. *Id.* The government's expert, James Olson, former CIA Chief of Counterintelligence, described the evidence of Ji's initial contact with Geng as the first step in what the intelligence community refers to as the "recruitment cycle." He opined that Ji was in the recruitment and assessment stage at this point; that he was being wined and dined, built up, and that it was unlikely he knew the true identity of his courters.[3] Tr. 622. Notably, on the date of his flight to the U.S., Geng was constantly texting Ji, and Ji simply ignored him. GE 2600. There was some evidence, however, that Ji accepted money from Geng for this flight. Tr. 866.

---

[3] During the middle of the trial, the government first translated text messages it had in its possession for years, Exhibit 314-318, and was permitted to introduce them over objection. Those included messages from July and August 2013 between Ji and his then-girlfriend, and tended to show Ji may have known the intelligence-related affiliation of Zha and Geng. Regardless, in those messages, Ji expressly disavows interest in joining their organization, claims they were trying to recruit him *domestically*, and that he himself chose instead to go overseas to study in the U.S. They also indicate that Ji was given three years to reconsider his refusal to join their organization.

Even so, Ji's first semester in America in the fall of 2013 was largely uneventful with few text messages between Ji and any alleged PRC intelligence officers during that period. Ji took his first return trip back to China in November of 2013. GE 900. Geng, believing Ji was still in the United States, messaged Ji in the middle of trip to check in on him, demonstrating his lack of awareness that Ji was back in China. GE 2600. This point was also established from the wider circumstances of the phone records. Mr. Olson agreed it would have been operationally important to meet and debrief back in China were Ji in fact an asset of Chinese intelligence. Tr. 489; 619.

The next flashpoint came during Ji's *second* return trip to China, which occurred over his first winter break, in December 2013 continuing into January 2014. He was first introduced to Xu Yanjun at this time and made multiple trips from his home province of Shandong to Nanjing, where Xu and the JSSD were headquartered. *See* GE 2600. The government introduced a photo of an "MSS registration form" from Ji's phone, which included an unsigned "pledge of allegiance" to Chinese intelligence. GE 312-T. It was undisputed that from this point forward Ji was aware of Zha, Geng, and Xu's alleged MSS-affiliation. The government also introduced a photo from Ji's phone of an alleged training document depicting how a Chinese student should handle questioning if approached by an FBI agent, as well as photos of cash Ji allegedly received from the MSS around this time. *Id.*

At this point, a year into the charged conspiracy, the dispute going forward remained whether Ji, in any bona fide sense, agreed to act in the United States on behalf of the MSS, and whether he ever so acted.

To support its position, the government introduced a January 2014 conversation between Ji and an old friend of his, Yu Wenzhi. *See* GE 302-T. The government claimed that these messages were an attempt by Ji to recruit Wenzhi as a "sub-agent" to steal science and technology secrets from the United States. In that conversation, Ji sent Wenzhi a photograph of the MSS registration form and some cash with the caption "operational fund." Amidst some loose talk and banter, including Wenzhi referring to Ji as having a "powerful patron," Ji asked Wenzhi, who was then enrolled in an aviation-related program at an American university, to help him by "acquaint[ing] yourself with more people in this field," and offering Wenzhi some money if he did. The conversation references the two following up over spring break when they anticipated seeing each other next. Despite the fact that the two remained close friends—including emailing each other while Ji was subject to pretrial detention up through at least late 2019 (*see* GE 1100)—there was no evidence whatsoever of any efforts to follow-up on this topic.

In July of 2015, after exchanging only New Years' greetings earlier that year, Xu reached out to Ji to ask how he was doing. GE 2600. Ji told him he was performing an internship at Motorola. *Id.* The defense proved that Ji was lying to Xu. Ji did in fact seek and obtain a job offer, but he backed out of it at the last minute a month prior to his texts with Xu. *See* Tr. 1682. Mr. Olson acknowledged that Motorola was a high-tech company, and as an intelligence officer, having truthful information from an agent on employment with such a company would have been very important. Tr. 631-33.

It was later that summer, beginning on August 24, 2015, that Xu attempted to re-establish contact with Ji by requesting a "favor." GE 2600. Xu sent Ji a list of names with

associated companies and other identifying information, and asked Ji to go onto specified websites and obtain lawful, public, and commercially available background reports. Ji eventually did as requested (with the noted exception that Ji disregarded Xu's collateral request that he take notes and compare the price and efficiency of the respective companies), and was reimbursed and compensated for doing so. *Id.* The government emphasized the fact that when sending the reports to Xu, Ji disguised the contents of the email in an encrypted file titled "midterm test questions." *See* GE 1205-T.  Several of the individuals on the reports testified at trial and all were in the field of science, technology, and aviation. *See, e.g.,* Tr. 1218-63.

The government called corporate representatives from two of these companies at trial. Tr. 656-85; 1277-1203. Both acknowledged that their websites simply aggregate publicly available records into a single, convenient report about a person. *See* Tr. 676. The service is held out and available to the general public and the websites could be accessed in China. Tr. 680-85.

The government also introduced exhibits 2900, 2901, and 2902, which included an October 29, 2015 application to the FBI internship talent network. This network was an application bank, so that when a job opened, individuals would get notification about the prospects of applying. Tr. 1309. Ji reportedly indicated his willingness to submit to a polygraph as part of the application, and all manner of background investigation, even though he was categorically disqualified from employment with the FBI because he was not a citizen. *See* Tr. 1344. The citizenship field was left blank on the application. Tr. 1344. Ji took no additional steps to gain employment with the FBI.

On May 20, 2016, Ji enlisted in the United States Army's MAVNI program. GE 2300. He did so for the purpose of obtaining citizenship, and he did not first notify Chinese intelligence of his intention to do so. It was entirely Ji's own idea, and not at all at the direction or control of a foreign official. *See* Dkt. # 158 GJ_007 pp. 4-5.

Nothing significant happened until almost two years later, on April 1, 2018, when Xu was arrested in Belgium by Interpol and U.S. authorities based on his recruitment of a GE employee without Ji's knowledge, awareness, or involvement. *See* Tr. 637. Soon after Xu's arrest (the news of which was suppressed in the United States and Ji was not made aware of (*see* Tr. 752)), the government targeted Ji and initiated an undercover "false flag" or "role player" operation and sent an undercover agent to engage Ji. The agent posed as a long-term overseas asset of the MSS named "Chen." Chen's ruse was to approach Ji pretending that he was sent by Zha Rong in the aftermath of Xu's arrest. Chen would then engage Ji to investigate whether or not any of Ji's previous communications or interactions with Xu led to Xu's arrest. *See* Dkt. # 144 p. 1 n. 1. The government subsequently recorded conversations between Ji and Chen on three separate occasions, all of which were introduced at trial. *See* GE 2100-2108-T. These recordings could fairly be described as the centerpiece of the government's case and were used to establish Ji' voluntary membership in the conspiracy.

The meetings had two components. The first involved Chen trying to determine which "acts" if any, Ji committed while in the United States. The government came up empty here. Ji repeatedly and truthfully denied joining the army at China's direction or obtaining any information (classified or not) from the Army for China. *See, e.g.,* GE 2103-T 40:49-41:20.

Chen then artfully shifted from asking Ji what he had or had not done for China in the past to what Ji would be willing to do for China in the future. It was during this second portion of the meetings when Ji made damning and inflammatory comments. The defense theory, however, was that Ji, as a Chinese citizen confronted by a powerful agent of the MSS who reports directly to Zha Rong—no less one that risked cover to contact Ji, and all the attendant circumstances—could not refuse to answer questions. Rather, because of the legal and extra-legal functioning of the Chinese state, it was reasonable to conclude Ji's statements were not based on free will made but that they were made in response to a clear and present threat. Thus the statements did not evince any true intent, but in this sense, compelled—they were involuntary and should not have been given any weight.

As will be discussed further, the government's theory at trial, presented through evidence, arguments, and the district court's instructions, was that any one of the January 2014 Wenzhi conversation, August 2015 lawful purchase and transfer of the commercial background reports, October 2015 FBI application, or May 2016 enlistment in the Army constituted Ji "acting" in his alleged capacity as an unregistered foreign agent. Ji was eventually found guilty of the § 371 conspiracy, substantive § 951 charge, and the false statement count, and acquitted of the two wire fraud charges. On January 25, 2023, Ji was sentenced to 96 months' imprisonment. Dkt. # 409.

## SUMMARY OF THE ARGUMENT

1.     During the first four years this matter was pending, all indications were that the government intended to prove the charges approved by the grand jury. For the "act" element of count two, that required proving the purchase and transfer of the legally obtained

commercial background reports. This remained the case until approximately a month before trial when the government first disclosed it intended to use Ji's alleged recruitment of a sub-agent, Yu Wenzhi, and his application to the FBI's Honors Talent Internship Program, as potentially qualifying actions. At trial itself, in addition to these newly claimed acts, the government presented Ji's enlistment with the United States Army as constituting the qualifying act, despite expressly informing the grand jury that Ji did *not* do so at the direction or control of a foreign government or official. By proving different qualifying "acts" than what was presented to the grand jury, the government constructively amended the superseding indictment.

2.     Subsection (d)(4) of Section 951 excludes from the definition of foreign agent any individual engaging in a "legal commercial transaction." The text and structure of this statute, as well as its purpose and history, all confirm that this provision creates an element of the offense that the government must disprove rather than an affirmative defense. This misapprehension in the charging process should have resulted in the district court dismissing count two on a number of grounds. Its refusal to do so was error.

3.     In its written ruling finding that § 951(d)(4) created an affirmative defense, the district court stated that "[w]hether Ji's purchase of background reports falls within the exception will be determined at trial," only to later fully bar presentation of this defense at trial. This ruling was predicated on a misreading of the relevant statutory provisions; namely, the district court imposed its own construction of an "agency limitation" on the exception's applicability, narrowing the statute's reach and expanding its proscription in the process. It also assumed for purposes of its pretrial ruling that Ji was in fact a "spy," i.e. otherwise acting

as an unregistered foreign agent of the PRC despite forceful protests to the contrary. The district court thus erred by deciding the merits of the defense and barring its presentation at trial.

      4.      The United States government, in a FBI-led "false flag" or "role player" operation, sent an undercover agent to engage Ji by posing as a long-term overseas asset of the PRC's intelligence, security, and secret police agency. In doing so, and to elicit the statements contained on the recordings, the undercover agent utilized the imprimatur of the Chinese government and tacitly if not explicitly relied on Chinese legal doctrines requiring Ji to speak to members of the Chinese government. Chinese law, and the extra-legal manner in which the Chinese state exercises power, make abundantly clear that when questioned by government representatives, its citizens, regardless of territorial location, are required to answer questions without exception. This is true, *a fortiori,* when the subject matter of questioning is the successful culmination of an international plan by one of its chief rivals to lure an alleged high-ranking intelligence officer into Belgium and have him extradited to face criminal charges; that is, one carrying international significance of the highest order.

      The undercover agent used a number of techniques—subtle at times perhaps but always clear in implication—to threaten, intimidate, and ensure that Ji would respond. Undoubtedly, in such a situation, an individual like Ji as a Chinese citizen did not have the right to voluntarily refuse questioning as the United States Constitution guarantees. By employing this ruse in an attempt to extract information from Ji, and by directing veiled threats at him, it deprived Ji of the right to voluntarily refuse to answer questions. Challenged

on appeal is the fact that the district court denied the related suppression motion without first holding an evidentiary hearing, despite a wealth of materially disputed facts.

5.       The defense sought to present the testimony of Professor Donald Clarke, an expert on all matters related to Chinese law and state. He would have explained to the jury his opinions regarding the relevant PRC legal and extra-legal provisions and practices that obligate its citizens to comply with national security efforts or risk severe punishment to themselves and/or family members. Professor Clarke's testimony was critical given the nature of the ruse the U.S. government employed to extract inculpatory statements from Ji in the course of the investigation. The defense theory was that no Chinese citizen could reasonably refuse to answer questions in that context, and thus the statements were involuntary and should not have been given any weight. The district court erred in barring his testimony entirely.

6.       The government is required to prove a defendant *acted* in the United States as a foreign agent without prior notification to the Attorney General in order sustain a conviction for 18 U.S.C. § 951. In other words, proof of an *action* is and has always been an element of the charge. This has been the non-controversial consensus since as long as § 951 has existed. As is routinely the case across the country, and as the defense requested here, the jury should have been instructed that it must unanimously agree as to how Ji allegedly *acted* as a foreign agent in order to sustain a conviction. The district court's refusal to do so constituted error.

7.       The defense requested a sentence of time served, while the government requested a sentence of 63 months' imprisonment—which after adjusting for time credit Ji

had accrued in the BOP while awaiting trial amounted to only about a difference in one month. The district court nonetheless imposed a non-guidelines sentence of 96 months' imprisonment. In the process, it disregarded otherwise applicable guidelines considerations, the finite and identifiable set of other sentencings for § 951 defendants, and numerous significant arguments in mitigation. It thus committed both substantive and procedural error, and the sentence was plainly unreasonable.

## ARGUMENT

I. **The Government Constructively Amended the Indictment.**

**A. Additional Relevant Background**

**i. Disclosure of New Qualifying "Acts"**

On August 10, 2022, the government began to produce its trial exhibits. *See* Dkt. # 342 pp. 5-6. It was at this time that the government informed defense counsel that it recently translated certain documents and learned of the Wenzhi conversation and the FBI internship application, and indicated its intent to argue that the exhibits constituted not just proof of the count one conspiracy, but of the qualifying "acts" for count two as well. *See* Dkt. # 342.

**ii. Trial Evidence, Arguments, and Instructions**

After the close of evidence, in response to a Rule 29 challenge, the government expressly argued that joining the Army was a qualifying action that Ji performed in his alleged capacity as an unregistered foreign agent. Tr. 1707. At the same time it walked the comment back after further arguments from defense counsel. Tr. 1709.

But then, come closing argument, the government presented a power point slide (*see* Dkt. # 417) *expressly* referring to joining the Army as evidence satisfying the "act" element of count two:



> ## Element 1 - Acting as an Agent of the MSS in the United States
>
> • RECRUITING YU TO HELP DEF. SPOT AND ASSESS STUDENTS
>
> • PURCHASE OF THE BACKGROUND REPORTS
>
> • STAYING IN THE U.S. TO HELP THE MSS
>    • PURCHASING THE FAKE JOB FROM FINDREAM SO HE CAN HAVE STATUS
>    • JOINING THE ARMY FOR, AMONG OTHER REASONS, HE COULD STAY IN THE U.S. AND TO PROVIDE THE MSS WITH INTELLIGENCE INFORMATION

In rebuttal, when counsel had no further opportunity to respond, the government conflated overt acts in furtherance of the count one conspiracy with acts as a "foreign agent" in count two, referencing the Wenzhi conversation, the FBI application, and joining the Army all as qualifying actions. Tr. 1860-61.

Counsel re-raised the constructive amendment claim after closing argument and asked for a mistrial based in particular upon the inclusion of joining the Army as a qualifying act as referenced in the power point slide.[4] This request was denied. Tr. 1899.

**B. Legal Standard**

A constructive amendment occurs where the charge is altered to fit the proof, and seeks conviction "on the basis of facts not found by, and perhaps not even presented to, the grand jury." *Russell v. United States*, 369 U.S. 749, 770 (1962). One occurs during trial when the indictment is broadened such that a jury considers more or different offenses or theories

---

[4] The district court's elements instruction—given over multiple objections—informed the jury that it needed to find only that Ji committed *some act* in the United States as a foreign agent. Dkt. # 376 p. 26.

of conviction than charged by the grand jury. *United States v. Liechtman*, 948 F.2d 370, 377 (7th Cir. 1991). This Court has further explained that a constructive amendment is found "where a 'complex set of facts' is presented to the jury during the trial which is distinctly different from the set of facts set forth in the [indictment]." *Id.* (quoting *United States v. Kuna*, 760 F.2d 813, 819 (7th Cir. 1985)). "Deprivation of such a basis right is far too serious to be treated as nothing more than a variance and then dismissed as harmless error." *Stirone v. United States*, 361 U.S. 212, 217 (1960). Instead, such an error requires *automatic* reversal. *See Ex Parte Bain*, 121 U.S. 1 (1887).

## C. The Government Constructively Amended the Indictment.

There was no dispute at any point throughout the pendency of this litigation that a qualifying "act," i.e., one in the United States and at the direction or control of a foreign government or official, is an essential element of the offense that must be proven beyond a reasonable doubt. *See, e.g.*, Dkt. # 309 p. 25.

The grand jury heard testimony concerning one singular act that Ji allegedly undertook at the direction or control of a foreign government official—the purchase and transfer of the commercial background reports. Xu did not allegedly send Ji a message requesting the purchase of the commercial background reports until August 25, 2015. The conduct was the singular "act" that Ji allegedly took at the direction or control of a foreign government or official. In fact, count two expressly reincorporated paragraph one of count one, which defined the background report companies, "Companies A, B, and C," as "United States-based companies that offered certain services for United States-based consumers, such

as the purchase of background reports on individuals that included their personal information."[5] Dkt. # 283 p. 2 ¶ 1(g).

As such, the presentation, testimony, and evidence of these other acts fundamentally altered the nature of the charge. It permitted the trial jury to deliberate on allegations that the grand jury was never apprised of, and never able to screen, as is its historic and constitutional function. Count Two was therefore constructively amended.

The point is aptly illustrated by the seminal Supreme Court case, *Stirone, supra*. That case involved a defendant charged with a Hobbs Act violation for unlawfully interfering with interstate commerce. *Id.* at 213. It specifically alleged that the defendant "caused supplies and materials (sand) to move in interstate commerce" in an unlawful way as the indictment further described. *Id.* As for the charging statute, "there are two essential elements [ . . .]: interference with commerce, and extortion." *Id.* at 218. As such, the type of "commerce" alleged in the indictment was far too critical to treat as something akin to surplusage. *Id.* Nonetheless, at trial, the government offered evidence of an effect on interstate commerce not only on the *sand* that would be shipped interstate to make concrete, but that the *concrete* would be used to construct a mill consisting of steel shipped in interstate commerce. *Id.* at 213.

---

[5] At one point the trial court declared that the sufficiency of a given indictment should not be reviewed in a "hyper-technical manner" in response to this point. *See, e.g.,* Dkt. # 90 p. 8. The flaw in this reasoning is that there was nothing "hyper-technical" about simply taking the government at its word in what it chooses to reincorporate and what it does not. Indeed, counsel would ask rhetorically: how would a non-technical, plain, or ordinary reading of the charging document be any different? Or how else was the defense supposed to read it? And in any event, there was no allegation regarding or referencing the Wenzhi conversation, the FBI application, or joining the Army at the direction or control of the PRC contained in the indictment or otherwise presented to the grand jury.

The Supreme Court held that this divergence in proof and allegations constituted a constructive amendment. *Id*. 219. After discussing the relevant principles of law, it reasoned:

> The grand jury which found this indictment was satisfied to charge that [defendant's] conduct interfered with interstate importation of sand. But neither this nor any other court can know that the grand jury would have been willing to charge that [Defendant's] conduct would interfere with interstate exportation of steel from a mill later to be built with [...] concrete. And it cannot be said with certainty that with a new basis for conviction added, [defendant] was convicted solely on the charge made in the indictment the grand jury returned. *Id*. at 217.

The Supreme Court further reasoned that "when only one particular kind of commerce is charged to have been burdened a conviction must rest on that charge and not another." *Id*. at 218. Indeed, this is despite the fact that, "even though it be assumed that under an indictment drawn in general terms a conviction might rest upon a showing that commerce of one kind or another had been burdened. The right to have the grand jury make the charge on its own judgment is a substantial right which cannot be taken away." *Id*. at 218-19.

The instant matter is similar to *Stirone* in that the alleged conduct at issue in both cases fundamentally related to an element of the offense—there it was materials in "commerce" and here it was an "act" as a foreign agent. Both are discrete and identifiable. Moreover, there was a closer and interrelated nexus between construction materials, *sand* versus *concrete*, whereas Ji's alleged "acts" had no *specific* connection to each other. They were separated by the passage of years (January 20, 2014, October 29, 2015, and May 20, 2016 respectively), involve different individuals and agencies, and none had the specific involvement of Xu or any alleged foreign government or official. This is not, for example, a shift in the proof of the background reports, such as purchasing reports on additional individuals, at slightly different times, online as opposed to from a store front, carrying it out

through the involvement of an alleged sub-agent, or any other moderate distinction. Instead, each other "act" involved an entirely different set of underlying facts. And like the grand jury in *Stirone*, the grand jury here heard no evidence or proof related to the act(s) embodied in the Wenzhi conversation or the internship application. And finally, like the indictment in *Stirone*, the superseding indictment here referenced only one "act," the alleged purchase and transfer of the background reports, and then come trial the government nonetheless offered proof of additional and distinct "acts."

The government therefore constructively amended count two of the superseding indictment. Although extensively preserved, this was *per se* error requiring reversal. *See United States v. Cusimano*, 148 F.3d 824, 832 n. 3 (1998).

## II.    The District Court Erred in Denying the Motion to Dismiss Count Two.

Disputed below was the question of whether 18 U.S.C. § 951(d)(4) excludes from the definition of foreign agent any individual engaging in a "legal commercial transaction." ("[f]or purposes of this Section, the term 'agent of a foreign government' . . . does not include . . . any person engaged in a legal commercial transaction"). The text and structure of this statute, as well as its purpose and history, all confirm that this provision creates an element of the offense that the government must disprove rather than an affirmative defense. The district court erred in holding otherwise and ruling accordingly.

### A.  Judge Trenga's Opinion

The question of whether 18 U.S.C. § 951(d)(4) establishes an element or an affirmative defense was first taken up by Judge Anthony J. Trenga in *United States v. Rafiekian*, 2019 WL 3021769 (E.D. Va. 2019). He found that proof of a qualifying action other than a

legal commercial transaction is an element the government must disprove and not merely an affirmative defense. As he noted, with the exception of the Eleventh Circuit, no reviewing court had previously considered the issue. *Id.* at *9.

Judge Trenga started his analysis by recognizing that "[a]n element of an offense is 'one whose specification . . . is necessary to establish the very illegality of the behavior.'" *Id.* (quoting *United States v. Hooker*, 841 F.2d 1225, 1231 (4th Cir. 1988)). "An affirmative defense, on the other hand, 'operate[s] to excuse criminal liability'; that is, it 'does not negate an element of a crime' but instead 'excuses punishment for a crime the elements of which have been established and admitted.'" *Id.* (quoting *United States v. Thompson*, 554 F.3d 450, 452 n. 2 (4th Cir. 2009) (additional citations omitted).

He then turned to a discussion of *McKelvey v. United States*, 260 U.S. 353, 357 (1922), a case where the Supreme Court explained the distinction between an element of the offense and an affirmative defense in great detail. *Id.*; *see also United States v. Cook*, 84 U.S. 168, 175 (1872)).

After a thorough survey of the applicable law, Judge Trenga held that § 951(d)(4) creates an element of the offense. Importantly, the statute's definition of "foreign agent" is one that excludes "any person engaged in a legal commercial transaction." *Id.* at *10. By defining "foreign agent" in such a manner, "the statute does not excuse an established criminal act, as an affirmative defense would; instead, it has 'render[ed] the underlying conduct noncriminal.'" *Id.* (quoting *Smith v. United States*, 568 U.S. 106, 111-12 (2013)). To *include* a defendant within the scope of the criminal prohibition, then, he or she must be *excluded* from engaging in conduct falling within the exception. Thus, proof of an "act" in

the capacity of an unregistered "foreign agent"; that is, an act other than a legal commercial transaction is a "specification . . . necessary to establish the very illegality of the behavior." *Id.* (quoting *Hooker*, 841 F.2d at 1231).

### B. The Fourth Circuit's Opinion

The Fourth Circuit reached a different conclusion. *United States v. Rafiekian*, 991 F.3d 529, 552 n. 10 (4th Cir. 2021) ("Fourth Circuit Opinion"). It relied to a large extent on *United States v. Royal*, 731 F.3d 333 (4th Cir. 2013), a case that analyzed the "antique firearm exception" contained within 18 U.S.C. § 922(g)(1). Based on §922(g) having an "offense provision, a definitional provision, and a separate exception," the antique firearm exception was held to constitute an affirmative defense. *Id.* at p. 20 (citing *Royal*, 731 F.3d at 338). The Fourth Circuit found § 951 to be analogous. *Id.*

Initially, counsel notes that neither Judge Trenga nor the Fourth Circuit acknowledged that § 951(d)(4) is unique in that it narrows the definition of "foreign agent" by limiting the universe of *actions* that trigger a given individual from falling within the term's statutory meaning. This is significant because § 951 does not prohibit unregistered foreign agents being present in the United States; rather, it criminalizes *acting* in such a capacity. "[E]ngag[ing] in a legal commercial transaction" is itself an action. And because "acting" as an unregistered foreign agent is the *actus reus* of the crime, there is a deeper and more intrinsic connection between the criminal prohibition and the definitional sentence that no doubt "render[s] the underlying conduct noncriminal" unlike the antique firearm exception. This is one reason the Fourth Circuit's eventual point, that were the commercial exception removed from § 951 the statute "would still define a perfectly cogent offense," was mistaken.

*See* Fourth Circuit Opinion at 543.

It is next important to note that *Royal*, by contrast, involved the definition of "ammunition" relevant to § 922(g). There was not simply one definitional provision narrowing multiple other elements of the offense; rather, "ammunition" is defined as any projectile "designed for use in any firearm" by § 921(a)(17)(A). "Firearm," in turn, is defined in § 921(a)(3) to exclude "antique firearms," which is then further defined in § 921(a)(16). Because the statutory scheme at issue in *Royal* required no less than three definitional provisions to modify one prong of the criminal prohibition (i.e. something far less than the entire *actus reus* of the crime), it is not "part and parcel" with the definitional sentence, unlike the provision at issue in § 951. §§ 921 and 922 are also distinct from § 951 because instead of creating a finite number of exceptions within a single provision, it created myriad. *See, e.g.*, *United States v. Johnson*, 981 F.3d 1171 (11th Cir. 2020) *United States v. Deleveaux*, 205 F.3d 1292 (11th Cir. 2000); *United States v. Gonzales*, 121 F.3d 928 (5th Cir. 1997); *United States v. McArthur*, 104 F.3d 1350 (11th Cir. 1997).

On an equally important point, Judge Trenga was correct to observe that the legal commercial transaction "exclude[s] an exceptionally broad category of potential defendants," unlike "the narrow antique firearms exception." Trenga Opinion at *11. The Fourth Circuit brushed off this fact by noting that in some instances exceptions excluding large categories of defendants are found to constitute affirmative defenses, and therefore, it was "unconvinced . . . this distinction makes a difference." Fourth Circuit Opinion at 543. In doing so, it failed to acknowledge its own point that the determination of whether an exception constitutes an element or affirmative defense "is not an exact science," *id.* at 541

(citing *Cook*, 84 U.S. at 174-75), and the reach of a definitional carve out is absolutely relevant to discerning legislative intent—the wider the reach of an exception the more integral it is to the statute and thus the more likely it was intended to be an element. Suffice to say, an exception that reaches a tiny number of defendants such as the one at issue in *Royal* is far easier to cast as an affirmative defense because framing the statutory charge without reference to the exception is straightforward and noncontroversial. In plain terms, defining "firearm" or "ammunition" without reference to their nature prior to 1898 proves to be a simple task. "Agent of a foreign government," by contrast, is purely a statutory creature, and because of its broad exclusion of a large number of defendants, modifies the criminal act in a manner sufficient to constitute an element.

This salient question with legislative intent is trying to discern whether these statutory provisions were intended to create an element of the offense or an affirmative defense. The Fourth Circuit based its decision almost entirely on an assumed similarity with federal firearm statutes that in fact proved distinct in critical respects. By doing so, and in the process, it gave insufficient consideration to the other enumerated factors, § 951's legislative history included—even though, again, it was admittedly attempting to navigate the metaphorical waters of an "inexact science." *Cf. Lindahl v. Office of Personnel Mgmt.*, 470 U.S. 768, 810 (1985) (White, J., dissenting).

Judge Trenga did, however, give thoughtful consideration to the relevant history of § 951, and explained it in great detail. Trenga Opinion at *11 (internal citations omitted). In summary, as murky as legislative history can prove on occasion, it is clear here that Congress intended for "foreign agents" to not be prosecuted if and when they engage in legal

commercial transactions, rather than to bolster their chances of acquittal after indictment and trial. While this purpose can be accomplished by altering the definition of the proscribed conduct, or adding exceptions to the otherwise applicable general rule, it can be better accomplished through the former, and especially so given the significance of the amendment's purpose.

### C. Additional Considerations

As careful a reading as *Rafiekian* deserves, there are a number of relevant considerations and arguments not discussed in those opinions.

First is the issue of whether this exception typically injects additional factual considerations outside those that comprise the offense itself into the trial, and which party is best positioned to prove those facts. This is an express factor courts should consider in determining how to categorize a statutory provision as an element or affirmative defense. *See, e.g., United States v. Shafi*, 252 F. Supp. 3d 787, 793 (N.D. Cal. 2017) (citing *McArthur*, 108 F.3d 1350).

With respect to § 951, the alleged commercial transaction typically adds no additional factual considerations to the trial, and at a minimum, will not add any that defendants are better positioned to prove or establish. Quite the opposite is true; that is, it is more difficult for the defense to attempt to prove a negative and rule out every conceivable law that could have been violated, whereas the government can rather easily point to and establish the supposed illegality at issue. In fact, even though the district court found § 951(d)(4) to constitute an affirmative defense—and went so far as to bar any presentation of that defense—extensive evidence concerning the background reports, their purchase,

transfer, and even the corporate terms of service were put forth in the government's case.

Second, and relatedly, is the fact that the exception is framed in the negative. Given that the exception describes what *does not* fall within the statute's ambit *in the first instance*, rather than what otherwise would *but for* proof of additional facts, it tends to narrow the reach of the offense itself, as opposed to removing otherwise covered conduct. This point is relevant both in regards to considering the structure of § 951 and because it constitutes additional grounds on which to distinguish the antique firearm exception at issue in *Royal*.

The third consideration also has to do with the structure of the statute. § 951 contains an exception to the exception—a meta-exception—as set forth in § 951(e). This provision exclusively limits the reach of the exception, excluding otherwise qualifying foreign agents if they worked on behalf of specified foreign governments. The fact that the exception contains its own exception elevates its place and importance within the hierarchy of the statute and gives it a more central and defining role with regard to the scope of the criminal prohibition itself. This point, especially when read in tandem with the fact that § 951(d)(4) contains a nexus with the "act" element (as it relates to a subset of otherwise qualifying "acts" itself), allows the conclusion that the structure of the statute supports Judge Trenga's reading to be drawn more firmly.

The last point counsel wishes to raise is with regard to ambiguity. To the extent the Court finds any to exist, the Rule of Lenity compels that it find in the defendant's favor. *See Abramski v. United States*, 134 S.Ct. 2259, 2281 (2014); *Burrage v. United States*, 134 S.Ct. 881, 891 (2014); *United States v. Bass*, 404 U.S. 336, 347-49 (1971); *United States v. Lanier*, 520 U.S. 259, 260 (1967).

After considering this matter, which remains one of first impression in our circuit, § 951(d)(4) should be read as modifying an element of the offense such that proof or allegations of a qualifying act other than a legal commercial exception is necessary to state an offense. The fact that it was not created a cascade of errors, including *mens rea* and *venue* defects, errors in the grand jury proceeding, and myriad eventual trial errors, all of which were raised below and require vacating Ji's conviction and dismissing count two (Dkt. # 141).

## III.  The District Court Erred in Deciding the Merits of the Legal Commercial Transaction Defense.

### A. Legal Standard

In general, the merits of an affirmative defense is an issue best left to the jury. *United States v. Plowman*, 700 F.3d 1052, 1057 (7th Cir. 2012). A defendant need not prove its merits in a pretrial proceeding; rather, a defendant need merely provide "sufficient evidence" from which a rational jury could infer it from. *Id.* The evidentiary showing creates a very minimal burden. It has been described as requiring but "more than a scintilla of evidence," *id.*, "slight," and sufficient even where it is otherwise "weak, insufficient, inconsistent, or of doubtful credibility." *United States v. Gurolla*, 333 F.3d 944, 951 (9th Cir. 2003) (citing *United States v. Becerra*, 992 F.2d 960, 963 (9th Cir. 1993)).

When conducting this inquiry, trial courts "must accept as true the evidence proffered by the defendants." *United States v. Tokash*, 282 F.3d 962, 967 (7th Cir. 2002). They are therefore not permitted to weigh the competing evidentiary proffers and accept the government's as more persuasive. *United States v. Mayfield*, 771 F.3d 417, 442 (7th Cir. 2019).

A district court's decision to bar an affirmative defense is reviewed *de novo*. *See, e.g.,* *Plowman*, 700 F.3d at 1057 (citing *United States v. Santiago-Godinez*, 12 F.3d 722, 726 (7th Cir. 1993)); *United States v. Backlund*, 689 F.3d 986, 995 (9th Cir. 2012).

**B.  Discussion**

**i.  18 U.S.C. § 951(d) is Not Limited by a Narrowing Agency Meta-Exception.**

In the proceedings below, the district court accepted the government's premise that Ji should be barred from asserting the legal commercial transaction defense because it applies only to "certain kinds of commercial agency relationships," those "engage[d] in spying activities" not among them. *See* Dkt. # 329 p. 3.

§ 951 proscribes acting in the United States as an unregistered foreign agent. Through an exception, the statute removes certain prospective individuals from the definition of "foreign agent"—those who are engaged in a legal commercial transaction.

The statute's intrinsic limitations on *who*, as otherwise qualified foreign agents, may avail themselves of this exception, is not drawn based upon certain "agency relationships"; rather, by the statute's plain language—its express terms—it restricts agents only from certain dangerous countries and a limited class of prior felons from doing so. The district court nonetheless found an implied, affirmative limitation—it *narrowed* the exception—restricting it to certain agency relationships and not others. In other words, it imposed additional limitations to its applicability that do not exist within the statute, and in the process, *broadened* the reach of the statute to the conduct alleged here when it otherwise would not have been covered.

When attempting to discern a statute's reach, we collectively must first consider its plain language. *See Bostock v. Clayton Cty.*, 140 S.Ct. 1731, 1749 (2020).

Upon doing so, two critical points emerge. First, the statute begins "[w]hoever, **other than a diplomatic or consular officer or attach**é, acts in the United States as an agent of a foreign government. . ." (emphasis added). This provision is important because it explains *who* falls within the category of applicable agents that must provide notification. Diplomatic officers, consular officers, and attachés are all examples of foreign agents acting under official or diplomatic cover. By referencing individuals *other* than those with official cover, the statute is necessarily referring to other foreign agents, to non-official ones—to "spies" even—which is precisely *who* the district court found that the exception does not apply to.

Subsection (e), § 951(e), is even more difficult to square with the district court's ruling. This subsection does in fact limit and narrow the reach of *who* can avail themselves of the legal commercial transaction exception. It sets forth two exceptions to the exception, but neither are at all of the nature the government and district court claimed. *Expresio unius est exclusion alterius*: "when Congress enacts specific limitations in a general statute it is presumed to allow other circumstances not included in those limitations." *Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 25-26 (D.C. Cir. 2012) (internal citations omitted).

The first one, § 951(e)(2)(A), does in fact preclude individuals with specific agency relationships from availing themselves of the exception. Not spies generally, but those hailing from identified countries that are deemed too dangerous and adversarial to American interests. It specifically *excludes* from the exception "such person[s]" who are or is an "agent

of Cuba or any other country that the President [or Attorney General] determines poses a threat to the national security interest . . . and so reports to [. . .] Congress."

In 1986 when this provision was added to the statute, the U.S.S.R. and certain of its satellites were added, and then subsequently removed in 1993. *See* Pub. L. No. 99-569, Title VII § 703 (Oct. 27, 1986); Pub. L. No. 103-199, Title II § 202 (Dec. 17, 1993). If the President and Attorney General exercised their congressionally-given authority to exclude PRC agents from the exception, Ji could not avail himself of this defense. That has never happened at any point in American history.

The second carve out the statute excises from the definition of "agents" are those with prior convictions related to violations of export control laws. 18 U.S.C. § 951(e)(2)(B). Even then, such persons may once again avail themselves of the exception and permissibly engage in legal commercial transactions without providing notification after a five-year period from the effective date of the conviction. *Id*. Ji, however, had no criminal history at all.

In light of the plain and obvious meaning of the statute, the district court's reliance on legislative history proved unpersuasive, and any reliance thereupon invariably leads to an unconstitutional result. To be clear, given the existence of clear carve outs that *do not* exclude certain "agency relationships," the plain language of the statute is straightforward and should end the inquiry. *See, e.g., Bostock, supra* at 1749. Regardless, the legislative history does not support the "agency" construction for the reasons argued below. *See* Dkt. # 334 pp. 6-7.

### ii. The Affirmative Defense was Improperly Barred Based Upon the District Court's Factual Acceptance of the Government's Contested Proffer.

Perhaps even more troubling than the above-described legal error was the fact that the decision to bar the affirmative defense would not have been possible without a pretrial acceptance of the government's contested factual narrative.

The government made little effort to hide the fact that it was basing its motion on the *a priori* assumption that Ji was in fact a willing and enthusiastic spy of the PRC. *See* Dkt. # 329.

The defense could not have disagreed more emphatically. And had the disputed inferences been drawn in Ji's favor as the standard requires—let alone had the presumption of innocence simply been applied as per usual—it becomes clear that there was far, far more than just a scintilla of evidence to refute the claim that he was a "spy." Counsel adopts here the extensive evidence and arguments that were put forth throughout the pendency of this case as further support on this point. *See, e.g.,* Dkt. # 202; Tr. 1819-52; 377. In any event, faced with two competing assertions—that he was/was not otherwise an individual willing and in agreement to act as an unregistered foreign agent of the PRC—it was improper for the district court to side with the government and bar presentation of the affirmative defense.[6]

For all of these reasons, the district court erred in deciding the merits of the legal commercial transaction defense and barring its presentation to the jury.

---

[6] This included barring the testimony of Mr. Nick Lewin, a former Deputy Chief with the United States Attorney's Office for the Southern District of New York, who the defense disclosed as an expert witness on this topic. *See* Dkt. # 289-1.

IV.    **The District Court Abused its Discretion in Denying the Motion to Suppress Statements Made to the Undercover Agent Without Holding an Evidentiary Hearing.**

   **A.  Legal Standard**

   The law on voluntariness, even in this unique context, remains clear and well-developed. Dkt. # 144 pp. 8-13. If a statement was the product of a ruse or some other stimulus or motivation, regardless if made in a custodial or non-custodial setting, the question remains the same: whether the statement was voluntary in light of the attendant circumstances. *See, e.g., United States v. Preston*, 751 F.3d 1008, 1020 (9th Cir. 2014) (en banc); *United States v. Haddon*, 927 F.2d 942, 946-45 (7th Cir. 1991); *United States v. Rutherford*, 555 F.3d 190, 195 (6th Cir. 2009); *United States v. Locklear*, 829 F.2d 1314, 1317 (4th Cir. 1987); *United States v Khomutov*, 2020 WL 1304834, *6 (N.D. Ill. 2020) (Chang, J.); *United States v. Oliver*, 142 F. Supp. 2d 1047, 1052 n. 1 (N.D. Ill. 2001) (Kennelly, J.).

   Counsel specifically requested an evidentiary hearing on this motion, and noted that hearings are required when a substantial claim is presented and there are disputed issues of material fact." *United States v. Edgeworth*, 889 F.3d 350, 353 (7th Cir. 2018) (internal citations omitted).

   This Court reviews a district court's refusal to hold an evidentiary hearing on a motion to suppress evidence for an abuse of discretion. *See, e.g., id.* This standard is violated, among other ways, when the district court relies upon a forbidden factor, fails to consider an essential factor, or uses an incorrect legal standard. *Smego v. Payne*, 854 F.3d 387 (7th Cir. 2017) (internal citations omitted). It also includes situations where the district court makes erroneous legal conclusions or relies upon a "clearly erroneous assessment of the evidence." *Gastineau v. Wright*, 592 F.3d 747, 748 (7th Cir. 2010) (internal citations omitted).

The district court committed an abuse of discretion for essentially all of these reasons. It applied an incorrect legal standard by failing to credit the defense's proffered set of facts and accepting the government's contested factual narrative prior to hearing or trial.

**B.  Ji's Statements Were Involuntary.**

This was a unique situation. Even within the long history of federal prosecutions, this case may very well have presented as the singular one involving a U.S. federal agent posing as a deep cover overseas Chinese intelligence officer in order to elicit incriminating statements from a Chinese citizen on U.S. soil. Put differently, far from "minor trickery," the FBI sent in an undercover agent to pose as a high-level operative of one of the world's most powerful intelligence agencies. Armed with inside information concerning the recent arrest of one of the agencies' own alleged intelligence officers—one that involved an international plot to lure Xu out of the relative safety of the PRC and into an extraditable location—the undercover agent impressed upon Ji how "serious" of a matter this was, and further, repeatedly emphasized and discussed the fact that the MSS was purportedly concerned that Ji was responsible for Xu's arrest.

Suffice to say, this is not a situation where anyone—and certainly not Ji—would feel anything other than compelled by "extrinsic considerations" to answer any and all questions posed by the undercover agent. Ji was a Chinese citizen lawfully present in the United States on a temporary visa. All of his family reside in China and sooner or later he will have to return to China. When the MSS purportedly sends a representative to stop him on the street out of the blue, halfway across the world on a non-descript afternoon as he is entering his apartment, informs him of a "very serious" international fiasco, and seeks to question him

regarding whether or not he is the "leak" giving rise to the pending crisis, the ramifications of refusing such a request to both his safety and comfort as well as that of his family is obvious and supportable in both black letter Chinese law (*see* Dkt. # 144 pp. 15-17) and the extra-legal functioning of the state.

Therefore, given the ruse employed by the FBI, Ji's statements were necessarily "compelled" by extrinsic considerations attendant to the interrogation, involuntary within the meaning of the relevant United States' constitutional provisions, and thus, should have been suppressed.

### C. The District Court Erred in Denying the Motion Without Holding an Evidentiary Hearing.

Even so, the specific issue on appeal was the district court's denial of the motion without first holding a hearing. Most erroneous was its *ex ante* reliance upon the government's proffer of *contested* and *disputed* facts. The district court either accepted the government's view, or refused to allow the defense to fully develop, the following relevant and contested pieces of evidence:

- The black letter requirements of PRC law, including the fact that it requires citizens to support, assist, and collaborate with all national security and intelligence efforts[7];
- That application of said laws demand that Ji answers the undercover agent's questions in this situation had he believed in the ruse;
- That the relevant PRC laws carry "extraterritorial application";

---

[7] The district court wrote that it was assuming for purposes of its ruling that "the characterization of Chinese laws is accurate but an evidentiary hearing was still not required. Dkt. # 208 p. 4 n. 4. But the prevalence, degree, and impunity through which the PRC government subjects its citizens to brutal, violent, and authoritarian behavior was highly relevant and required actual examination. Put simply, the more widespread, common, and open these practices are, the more readily they can be imputed to Ji's knowledge come April 25, 2018. Establishing the quantum was just as important as establishing the fact of the practices themselves. The district court stated that it assumed the truth of the latter (despite giving no indication it in fact did so), but in the process, foreclosed any possibility of proof on the former, and erroneously so.

- That Ji in fact believed the undercover agent to be a high ranking long term overseas asset of Chinese intelligence based upon the undercover agent's false representations to him;
- The extralegal means through which Chinese intelligence carries out its agenda, including coercion, threat, imprisonment, bodily injury, torture, and death to the individual and/or the individual's family;
- That the government's meticulous planning and strategizing of this operation included extensive investigation, consideration, and utilization of Ji's individual psychological characteristics, personality, etc., and that the undercover agent's interactions with Ji were specifically structured to take advantage of or "exploit" Ji's personal psychological characteristics;
- On scene surveillance agents' observations of Ji's physical demeanor[8];
- Ji's efforts to cancel or at least delay the initial meeting request based upon his fear[9];
- Evidence regarding Ji's condition and vulnerabilities on the date of the September 25, 2018 meeting;
- Ji's state of mind and demeanor during the meetings (Dkt. # 177 p. 5);
- That Ji *did not* report flying to China by way of Japan to obscure his travel (Dkt. # 177 p. 6);
- That Ji was not "in command" of the conversation during the second meeting as the government claimed (Dkt. # 177 p. 6);
- That Ji's purported "plan" to join the military and become gainfully employed had nothing to do with Xu Yanjun (Dkt. # 177 p. 7);
- That the undercover agent made numerous, repeated threatening statements despite the government's claim (Dkt. # 177 p. 9) that were subtle but clear in implication; that the undercover agent did, in fact, allude to the possibility that Ji was in trouble (legal or extra legal) depending on the responses and information he provided (Dkt. # 177 p. 9), as well as the possibility of positive consequences due to his cooperation; and
- The additional, repeated, and persistent efforts to contact Ji made by the undercover agent outside of the three meetings.

*See* Dkt. # 192 pp. 20-22.

Legally speaking, the district court stated that it found *United States v. Lawal*, 231 F.3d 1045 (7th Cir 2000) "instructive," although it did not explain how. Regardless, a careful reading of *Lawal* reveals just how critically differently that case was.

---

[8] Some of these were put forth through the case agent's testimony years later at trial. Tr. 1695.

[9] There was some testimony about this point at the eventual trial as well, as Ji made up an excuse to get away from the undercover about needing to leave their initial encounter to mail a parcel. Tr. 719.

Noah Lawal's fellow Nigerian confederate was arrested by ICE while trying to walk through Logan International Airport with heroin stuffed in her unusually oversized shoe. *Id.* at 1047. This confederate began cooperating, and after Lawal and a third individual went to a hotel room in the hopes of obtaining the intercepted heroin, law enforcement was waiting and arrested him. *Id.*

Most importantly, the law enforcement officers made no secret of the fact that they were, unmistakably, United States federal law enforcement officers. *Id.* They apparently were in plain clothes and identified themselves as much upon approaching Lawal; they formally arrested him and took him to a marked, conspicuous police station; they read him his *Miranda* rights and had him sign a written waiver form after acknowledging his understanding. In short, there were no objective or external considerations from which to conclude that the government was trying to trick Lawal, or play on his subjective fears—any delusions or concern that the officers or agents who were in fact asking him questions were members of an abusive foreign government that would not hesitate to torture or imprison him were only that—subjective delusions and nothing more—and certainly not part of a pre-planned ruse.

The investigation into Ji was critically different. It involved the intentional and strategic deployment of a ruse carefully designed to "exploit" Ji. When approached by a long-term overseas asset of the MSS, it is widely understood and accepted that black letter PRC law as well as the practical ramifications of non-compliance include deprivation of liberty and/or property, bodily injury, torture, and even the possibility of death to the individual and/or his or her family. Ji grasped the objective situation exactly as the government

presented it; that is, he did not at all doubt he was in fact a long-term overseas Chinese intelligence asset sent to question him in response to an emergency international situation. Noah Lawal, by contrast, misunderstood a plain clothes United States law enforcement drug interdiction and arrest because of his past experiences and subjective (delusional) expectations about how the police interaction would unfold. Because law enforcement did nothing to play on those delusions or "exploit" them, *Lawal* did not involve police coercion.

The subjective versus objective distinction was an important one. As argued below, the authoritarian and brutal nature of Chinese policing and intelligence is an open and observable truth to the world at large. It is something all Chinese citizens know and understand, and something the United States government itself readily and publicly acknowledges. *See* Dkt. # 144 n. 1.

It is fair to question then what manner of proof on the point was altogether necessary just to get an evidentiary hearing. This was especially true in light of the fact that American jurisprudence does not presume subjective ignorance of the law. *See, e.g., United States v. Dobek*, 789 F.3d 698, 699 (7th Cir. 2015) (reiterating that "[o]rdinarily a person is conclusively presumed to know the law"). This point was raised below, and standing alone, should have been sufficient to obtain a hearing. The district court, however, did not provide a direct response. Dkt. # 208.

Counsel did nonetheless proffer that although it is not recorded on video, when Ji was first approached out-of-the-blue on the street in front of his house by the undercover agent, he was terrified upon learning who the undercover agent claimed to represent. Dkt. # 192 p. 17. Ji tried to get out of the situation by bringing up his prior obligations and the

Army training he had that evening. *Id.* The undercover agent persisted, bringing up the private hotel room he had nearby. In light of the pressure, Ji asked to leave for just a few minutes to handle some errands. *Id.* He was visibly upset, disturbed, and anxious as he briefly returned to his apartment. *Id.* Like all Chinese citizens would in this situation, Ji held a realistic fear that his refusal to speak with the purported operative could result in dire consequences for him and his family. *Id.*

In any event, for all of these reasons, and as argued below, the district court abused its discretion in denying the motion to suppress without first holding an evidentiary hearing.

**V.    The District Court Erred in Barring the Defense from Introducing the Expert Testimony of Donald Clarke.**

### A.  Legal Standard

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)  the testimony is based on sufficient facts or data;

(c)  the testimony is the product of reliable principles and methods; and

(d)  the expert has reliably applied the principles and methods to the facts of the case.

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Fed. R. Evid. 702.

An expert witness is permitted wide latitude to offer opinions, including those not based on firsthand knowledge or observation, so long as the expert's opinion has a reliable basis in the knowledge and experience of his discipline. *Jinro Am. Inc. v. Secure Investments, Inc.*, 266 F.3d 993, 1004 (9th Cir. 2001). Expert testimony is not limited to opinion

testimony; rather, experts may expound upon relevant principles from their field or area of discipline. Fed. R. Evid. 702 advisory committee notes to 1972 proposed rules.

This Court first reviews *de novo* whether or not the district court properly applied the *Daubert* standard as codified in Rule 702, and then evaluates admission for an abuse of discretion. *United States v. Gardner*, 840 Fed. Appx. 6, 7 (7th Cir. 2021).

### B.  Professor Clarke's Proffered Opinions

The defense intended to call Professor Clarke to state opinions largely consistent with those set forth in his declaration filed in support of the motion to suppress statements made to an undercover agent. Dkt. # 192-4.

Counsel challenged the weight of those statements at trial based on the same voluntariness arguments, and intended to make them with all the more force in light of Professor Clarke's opinions on the subject. Specifically, had the district court not barred his testimony, he would have been called upon to utilize his specialized knowledge to explain the relevant circumstances of the Chinese state, its laws, and its functioning so that the jury could make an educated judgment regarding the appropriate weight to attribute to these statements. His proffered opinions included his belief that:

- Chinese law, specifically the National Intelligence Law ("NIL"), obliges Chinese citizens to cooperate with intelligence work;
- This obligation is not subject to territorial boundaries; and
- Despite the absence of a specific sanctioning mechanism, the Chinese state can in practice enforce this obligation through a variety of explicit and implicit threats. Because the Chinese state is not constrained by Chinese law, those threats can be carried out even if they lack a legal basis, and citizens know this.

Professor Clarke would have elaborated further by stating that, while it is important, the key question is not what Chinese law says about the ability of the Chinese government

to require citizens to provide information and assist in intelligence gathering. The question is what the Chinese government can *actually require*.

On this point, Professor Clarke would have also testified that the Chinese political system is essentially Leninist in nature, and recognizes no limits on government power. The Chinese party-state is not meaningfully constrained by Chinese law. This is particularly so in matters deemed relevant to national security.

There are nonetheless relevant and instructive laws applicable to this analysis. Those include sections of the NIL, Articles 7 and 14, which were cited in full in his disclosure.

Professor Clarke would have explained that the NIL by its terms covers the obligations of Chinese citizens, and there is no indication that such obligation ceases at its physical, territorial boundaries. There is no question that the obligation to cooperate under the NIL is enforceable as a practical matter by the Chinese state. The Chinese state is not meaningfully constrained by law, and therefore its agents may credibly threaten a wide variety of consequences to those who do not cooperate when asked. Such consequences could extend beyond the person in question to relatives, for example, so even ex-patriates are vulnerable.

### C. Professor Clarke's Testimony Satisfied Rule 702 and Should Have Been Admitted.

Professor Clarke's opinion testimony was relevant, helpful, and otherwise admissible because it would provide the jury with the technical and specialized information needed to understand the nature of the Chinese state, its legal system, and how it exercises power. This knowledge, in turn, was necessary for it to weigh and make sense of the statements Ji made to "Chen."

For example, there were competing inferences to be drawn regarding his statements about gaining access to military bases in the future that are usually restricted to native Chinese individuals. The government argued it demonstrated Ji's culpable intent, willingness to advance the conspiracy, and more. The defense was arguing that he did not mean it and was merely trying to please and placate the undercover agent out of fear of the potential repercussions to himself and his family given the subtext. The same is true for Ji's statements about potentially finding a job with NASA or other American companies and/or governmental agencies in the future. *See* Tr. 1845. The government argued these again evinced his knowing and willing participation in the conspiracy and other alleged crimes. The defense argued this was a situation where Ji or anyone in his shoes would have made whatever comment necessary to deflect scrutiny let alone punishment from the PRC and MSS, absent any true intent.[10]

Based on the foregoing, and as argued below, barring Professor Clarke's testimony constituted error.

---

[10] The government, by contrast, was permitted to call a "general" expert on China, Joe McReynolds. Amidst the vast and wide-ranging subject matter of his testimony, Mr. McReynolds was permitted to opine on the subjective beliefs and motivations of its citizens. That is, Mr. McReynolds started to explain the reasons why Chinese citizens may subjectively decide to join the CCP: "[t]o be a member means that you decided for whatever reason that you wanted to take an additional step, maybe out of political zeal, but much more often than that, it's because – for your personal advancement." Tr. 77. Counsel expressly objected in light of this ruling and cited the fact that the government's expert was now opining on the subjective motivations for joining the CCP, which carried the additional flaw of being far afield of any relevant and contested issue. The objection was nonetheless overruled.

**D. In the Alternative, the District Court Erred by Not Instructing the Jury as to the Relevant Provisions of PRC Law.**

In the alternative, counsel challenges the district court's refusal to instruct the jury on the relevant provisions of PRC law as was requested after it barred Professor Clarke's testimony in its entirety. *See* Dkt. # 356 pp. 10-12; Tr. 1768.

## VI. The District Court Erred by Refusing a Unanimity Instruction Regarding the Elements for § 951.

The defense specifically requested the jury be provided a unanimity instruction as to count two, the substantive § 951 charge. *See* Dkt. # 356 p. 8. Modeled on the one given in *United States v. Dumeisi*, 03 CR 664 Dkt. # 105, the proposed instruction read as follows:

> To find the defendant guilty of acting in the United States as an agent of a foreign government without prior notice, you must unanimously agree as to the act [or acts] he performed in the United States as an agent of the foreign government.

After hearing arguments, the district court denied the requested instruction and provided none that put the specific concept of unanimity before the jury. Tr. 1771-72.

The general consensus is that jury unanimity is required when the government alleges more than one possibility for an element of the crime, but not when the government contends that the defendant committed an element of the crime using one or more of several possible means. *Richardson v. United States*, 526 U.S. 813 (1999); *Schad v. Arizona*, 501 U.S. 624, 631-32 (1991); *Johnson v. Louisiana*, 406 U.S. 356, 369-71 (1972) (Powell, J., concurring). This Court reviews *de novo* the district court's decision to refuse a jury instruction "when the underlying assignment of error implicates a question of law." *United States v. DiSantis*, 565 F.3d 354, 359 (7th Cir. 2009).

Here, with respect to § 951, the qualifying "act" itself is properly held as an element for which jurors must unanimously agree upon. *Cf. United States v. Ji*, 2020 WL 1689826, *2 (N.D. Ill. 2020).

This means § 951 in not a "status" crime. It is not enough for criminal liability to be an unregistered foreign agent in the United States. Rather, one has to affirmatively act at the direction or control of a foreign government.

And second, not simply any "act" will do—§ 951 exempts "legal commercial transactions" from the universe of "acts" that constitute a crime. This suggests that the "act" itself is best considered an element of the offense. If the act or acting requires no specificity as to any given fact, then there would be nothing left to the element for the government to prove. To define the element in a way that requires no unanimous agreement as to the specific "act" or factual circumstances of the act would render the "element" and the "means" synonymous.

In any event, beyond *Dumeisi* as noted, district courts routinely give a unanimity instruction as to the "act" element, and often without objection from the government. *See, e.g., United States v. Latchin*, 04 CR 661 Dkt. # 216 p. 12; Dkt. # 287 p. 23 (N.D. Ill. 2007) (Pallmeyer, J.); *Dumeisi, supra*; *United States v. Chi Mak*, 05 CR 293 Dkt. # 538 p. 27 (C.D. Cal. 2007); *United States v. Abouammo*, 19 CR 621 Dkt. # 356 (N.D. Cal. 2022).

For all of these reasons, the district court's refusal to provide a unanimity instruction as to the act element of a § 951 charge constituted reversible error.

**VII.    The District Court's Sentence of 96 Months' Imprisonment was Plainly Unreasonable.**

For sentences imposed where there is no applicable guidelines provision, appellate scrutiny centers on whether the chosen sentence is plainly unreasonable. 18 U.S.C. § 3742(e)(4).

Reasonableness is generally divided into two considerations: procedural and substantive. Procedural reasonableness concerns the procedures a sentencing court employs in arriving at a sentence. *See United States v. Villafuerte*, 502 F.3d 204, 206 (2d Cir. 2007). Substantive reasonableness "involves the length of the sentence imposed in light of the factors enumerated under [. . .] § 3553(a)." *Id.*

As part of the requirements of procedural reasonableness, a district court must state its reasons for imposition of a particular sentence. *See* 18 U.S.C. § 3553(c). As this Court has described, "[a] sentencing court errs procedurally when it fails to explain adequately the chosen sentence." *United States v. Shoffner*, 942 F.3d 818, 822 (7th Cir. 2019).

There is not necessarily a "bright line" for what does and does not constitute an adequate explanation. *See United States v. Reed*, 859 F.3d 468, 472 (7th Cir. 2017). At one end of the spectrum, a "rote statement" that the judge considered all relevant factors is generally insufficient. *United States v. Lyons*, 733 F.3d 777, 785 (7th Cir. 2013). But that is not meant to imply that the judge must recite and address each of the § 3553(a) factors or even all of a defendant's arguments for a lighter sentence. *See United States v. Rodriguez–Alvarez*, 425 F.3d 1041, 1047 (7th Cir. 2005); *United States v. Cunningham*, 429 F.3d 673, 676-79 (7th Cir. 2005).

The middle ground typically requires a response to all principal, nonfrivolous arguments in mitigation, *United States v. Salvanki*, 458 Fed. Appx. 559, 562–63 (7th Cir. 2012)[11]; while on the other hand excuses the failure to address all stock, pithy, or frivolous arguments. *See id.*; *United States v. Dean*, 414 F.3d 725, 729 (7th Cir. 2005); *Cunningham*, 429 F.3d at 676-79.

Reviewing courts also expect more of an explanation for a non-guideline sentence. *United States v. Vasquez-Abarca*, 946 F.3d 990, 994 (7th Cir. 2020). In fact, in *Gall*, the Supreme Court explained that "a major departure should be supported by a more significant justification than a minor one." *Gall v. United States*, 552 U.S. 38, 50 (2007).

In this case, the district court chose a sentence that in total resulted in a 96-month term of imprisonment. That sentence was not within or supported by any remotely analogous guideline; it vastly exceeded the sentence imposed on nearly all other defendants convicted of a § 951 violation; and it even vastly exceeded the 63 month recommendation that the government argued for—it was a 52% or 33 month increase. This sentence was substantively unreasonable, and the sentencing court could not have arrived at this figure without committing significant procedural error as it did.

Prominent among those errors was the fact that it chose not to address many of the substantial arguments in mitigation. One example was the specific, unique, and more terrible ways in which Ji suffered through his imprisonment than the average defendant. Dkt. # 390 pp. 20-21; 1/25/23 Tr. p. 13. He was someone whose family and friends were half a world away and did not receive any semblance of regular contact, certainly not in the form of social

---

[11] *See also United States v. Arberry*, 612 F.3d 898, 899 (7th Cir. 2010), *see also United States v. Garcia–Oliveros*, 639 F.3d 380, 381–82 (7th Cir. 2011).

visits that so many look forward to. Then the pandemic happened, which he endured locked away in the MCC. But worse, as social and political theories swirled in the public discourse about the origins of COVID-19 and the PRC's role in releasing it upon the world, many inmates personally blamed and scapegoated him. He thus suffered overt and severe racism in the process. Even the government fairly acknowledged how mitigating this was, describing it as "abhorrent" and a factor the district court could consider in mitigation. Dkt. # 393 p 14 n. 6. The district court nonetheless chose not to.

The same is true with respect to the deportation consequences Ji was sure to face as a result of the conviction, as well as many of the important, undisputed facts applicable to sentencing. Dkt. # 390 p. 25; 1/25/23 Tr. p. 13. The district court found, discussed, and relied upon to a significant extent Ji's ostensible malicious intent and willingness to commit the offense and harm the United States, even above and beyond what was contemplated by the intelligence officers. In the process it simply ignored the arguments about how Ji was presented with multiple employment opportunities at powerful U.S. defense contractors and technology corporations, Motorola and Qualcomm. Dkt. # 390 pp. 18-19. The government's expert at trial, James Olson, expressly stated he believes that "the MSS would be very interested in having one of its assets associated with Motorola." Tr. 631. It was independently established, however, that Ji "ghosted" Motorola and simply chose not to work there despite the myriad operational advantages it provided had he in fact been interested and so malevolently intentioned. The same is true with a 2016 job opportunity that arose with respect to Qualcomm, the "world's leading wireless technology innovator," a defense

contractor, and chief competitor of Huawei. Ji simply ignored the offer, as the district court did with these arguments. Dkt. # 390 p. 19.

On the same point, in analyzing Ji's role in the offense, the district court again ignored significant, uncontroverted evidence. This even included the testimony of the former CIA Chief of Counterintelligence and government expert, James Olson. Mr. Olson was unequivocal that Ji was but a co-optee, i.e., one who gets tasked by an intelligence officer or "operator." Tr. 520. Those individuals have an important role in intelligence operations to be sure, but they are expendable and essentially cannon fodder—not the ones who deserve sentences approaching the statutory maximum, especially when they take such limited action further limited to otherwise legal activities such as purchasing commercial background reports. But in any event, the failure to address these important arguments was procedural error.

As problematic as the foregoing is and was, the most significant error may well have been the district court's refusal to consider any objective sentencing metric. The § 3553(a) factors expressly require consideration of the guidelines themselves, and similarly-situated defendants.

The government's repeated and formal yet non-binding predictions were that U.S.S.G. § 2M3.3 was the most applicable guideline (even if the § 3553(a) factors controlled). Dkt. # 393 p. 2. Going through the calculations led to a suggested range of 51 to 63 months' imprisonment, and the government in fact made a formal recommendation of 63 months at the time of sentencing. *Id.* p. 17. The defense noted that § 2M3.3 pertained to the willful transmission of defense information, primarily covering violations of 18 U.S.C. § 793—a

much more serious offense that requires *actual* transmission of NDI or classified information. The applicable note to the guidelines commentary expressly states that this provision applies only when a defendant actually transmits national defense information or classified information. U.S.S.G. § 2M3.3 Background cmt.

So the defense position was that this provision was flawed in that it was overly-harsh, but upon crunching the numbers, it nonetheless produced an advisory range largely consistent with what both the defense and government were requesting. The district court confirmed that the defense was making a "discretionary argument with respect to what the actual sentence should be," 1/25/23 Tr. 5, but never made a substantive comment.

The other objective guidepost was that provided by § 3553(a)(6), which requires courts to consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. Given the rarity of § 951 prosecutions, there was a discrete and identifiable data set to compare Ji and the offense conduct to. The defense did just that, presenting a table with 70 such prosecutions as part of its sentencing brief. Dkt. # 390 p. 31. Any rational view of these data points made lucid the fact that even a sentence of time served would have left Ji receiving a significantly harsher sentence than others.

To further illustrate the point, the defense discussed at great length the prosecutions of Xiaoqing Zheng, Ying Lin, Zoasong Zheng, Qian Li, Jun Wei Yeo, Yu Xin Kang, Hao Zhang, Amin Yu, Kun Shan Chun, and Ahmad Abouammo. Dkt. # 390 pp. 38-42.

In response to these arguments the district court stated "[e]ach case is unique," but in effect said nothing. 1/25/23 Tr. 29-30. Accepting this statement—to the extent it

constitutes a substantive response—would effectively eliminate this factor because "[e]ach case is unique." It, too, constituted procedural error.

That leads into the lacking substantive reasonableness of the district court's 96 month sentence, despite an effective recommendation of time served (approximately 52 months) from the defense, and a 63 month recommendation from the government, in light of all other facts and concerns. There was no explanation or justification for *why* 96 months, as opposed to 90, 84, 78, 63, 52, or any other number would have sufficed for purposes of sentencing. Nor could there have been one. For all of the reasons the defense argued and the government, however vociferous they otherwise were, acknowledged, the sentence was substantively unreasonable. Under 18 U.S.C. § 3742(e)(4) it was thus plainly unreasonable and the matter should be remanded for resentencing.

## <u>CONCLUSION</u>

Based on the foregoing, Mr. Ji, through counsel, respectfully requests that this Court vacate his judgment and conviction, dismiss the superseding indictment and/or remand for a new trial or resentencing, and order any other just and appropriate relief.

Respectfully Submitted,

/s/ Damon M. Cheronis
Attorney for Defendant-Appellant

**Damon M. Cheronis**
Cheronis, Parente & Levitt LLC
140 S. Dearborn Street, Suite 404
Chicago, Illinois 60603
(312) 663-4644
damon@cheronislaw.com

/s/ Ryan J. Levitt
Attorney for Defendant-Appellant

**Ryan J. Levitt**
Cheronis, Parente & Levitt LLC
140 S. Dearborn Street, Suite 404
Chicago, Illinois 60603
(312) 663-4644
ryan@cheronislaw.com

## CERTIFICATE OF COMPLIANCE PURSUANT TO
### 7th CIR. R. 30(d)

I certify pursuant to 7th Cir. R. 30(d) that the appendix included with this brief on

appeal incorporates the materials required under Circuit Rule 30(a) and (b).

/s/Ryan J. Levitt

**Ryan J. Levitt,**
One of the attorneys for Defendant-Appellant

### CERTIFICATE OF COMPLIANCE PURSUANT TO
### FED. R. APP. P. 32(A)(7)(C)

I certify pursuant to Fed. R. App. P. 32(a)(7)(C) the foregoing brief is proportionally spaced, has a typeface of 12 points, and contains 13,952 with respect to the sections discussed in Rule 32 and corresponding Circuit Rule.

/s/Ryan J. Levitt
**Ryan J. Levitt,**
One of the attorneys for Defendant-Appellant

**CERTIFICATE OF SERVICE**

I hereby certify that on July 26, 2023 I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/Ryan J. Levitt
**Ryan J. Levitt,**
One of the attorneys for Defendant-Appellant

## SHORT APPENDIX: TABLE OF CONTENTS

Amended Judgment in a Criminal Case ......................................................................... A 1-7

New Trial Order (Dkt. # 389) ...................................................................................... A 8-17

Order on Constructive Amendment Motion in Limine (Dkt. # 354) ........................ A 18-19

Order on Motion to Dismiss Count Two (Dkt. # 204) ............................................... A 20-28

Order on Affirmative Defense (Dkt. # 368) ................................................................ A 29-33

Order on Motion to Suppress Statements (Dkt. # 208) ............................................. A 34-38

Order on Defendant's Expert Witnesses (Dkt. # 311) ............................................... A 39-46

ILND 245C (Rev. 03/12/2020) Amended Judgment in a Criminal Case
Sheet 1

(Note: Identify Changes with Asterisks (*))

# UNITED STATES DISTRICT COURT
## Northern District of Illinois

UNITED STATES OF AMERICA

v.

JI CHAOQUN

**Date of Original Judgment: 2/2/2023**
**(Or Date of Last Amended Judgment)**

**Reason for Amendment:**

☐ Correction of Sentence on Remand (18 U.S.C. 3742(f)(1) and (2))

☐ Reduction of Sentence for Changed Circumstances (Fed. R. Crim. P. 35(b))

☐ Correction of Sentence by Sentencing Court (Fed. R. Crim. P. 35(a))

☒ Correction of Sentence for Clerical Mistake (Fed. R. Crim. P. 36)

**AMENDED JUDGMENT IN A CRIMINAL CASE**

Case Number:    1:18-CR-00611(1)

USM Number:    53421-424

Damon Matthew Cheronis
Defendant's Attorney

☐ Modification of Supervision Conditions (18 U.S.C. §§ 3563(c) or 3583(e))

☐ Modification of Imposed Term of Imprisonment for Extraordinary and Compelling Reasons (18 U.S.C. § 3582(c)(1))

☐ Modification of Imposed Term of Imprisonment for Retroactive Amendment(s) to the Sentencing Guidelines (18 U.S.C. § 3582(c)(2))

☐ Direct Motion to District Court Pursuant ☐ 28 U.S.C. § 2255 or ☐ 18 U.S.C. § 3559(c)(7)

☐ Modification of Restitution Order (18 U.S.C. § 3664)

**THE DEFENDANT:**

☐ pleaded guilty to count(s)

☐ pleaded nolo contendere to count(s)    which was accepted by the court.

☒ was found guilty on count(s) one (1), two (2) and five (5) of the Superseding Indictment after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| **Title & Section / Nature of Offense** | **Offense Ended** | **Count** |
|---|---|---|
| 18:371.F Conspiracy To Defraud The United States | 09/25/2018 | 1s |
| 18:951.F Impersonating Agents Of Foreign Governments | 09/25/2018 09/25/2018 | 2s |
| 18:1001.F Statements Or Entries Generally | 09/25/2018 | 5s |

The defendant is sentenced as provided in pages  **2**  through  **2**  of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984. **Other than the amendments or modifications stated in this judgment, the judgment previously entered shall stand. (See attachments)**

☒ The defendant has been found not guilty on count(s) three (3) and four (4) of the Superseding Indictment.

☒ All remaining count(s) are dismissed on the motion of the United States.

      It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

January 25, 2023
Date of Imposition of Judgment

Signature of Judge

Ronald A. Guzman, United States District Judge
Name and Title of Judge

February 3, 2023
Date

Case: 1:18-cr-00611 Document #: 409 Filed: 02/03/23 Page 2 of 7 PageID #:7273

ILND 245C (Rev. 03/12/2020) Amended Judgment in a Criminal Case
Sheet 2 – Imprisonment       Case: 23-1262       Document: 14       Filed: 07/26/2023       Pages: 108   (Note: Identify Changes with Asterisks (*)) Judgment – Page 2 of 2

DEFENDANT: JI CHAOQUN
CASE NUMBER: 1:18-CR-00611(1)

# IMPRISONMENT

***The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
Sixty (60) months as to count one (1); Sixty (60) months as to count five (5) terms to run concurrently with one another; Ninety-six (96) months as to count two (2) of the Superseding Indictment to run concurrently to Counts (1) and (5) of the Superseding Indictment. Cost Waived.

☒ The court makes the following recommendations to the Bureau of Prisons: West Coast BOP.

☒ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

   ☐ at          on

   ☐ as notified by the United States Marshal.

   ☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐ before 2:00 pm on

   ☐ as notified by the United States Marshal.

   ☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows: _____

_____

_____

Defendant delivered on _____ to _____ at _____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

# UNITED STATES DISTRICT COURT

## Northern District of Illinois

UNITED STATES OF AMERICA

v.

JI CHAOQUN

)
)
)
)
)
)
)
)
)
)

**JUDGMENT IN A CRIMINAL CASE**

Case Number:     1:18-CR-00611(1)

USM Number:     53421-424

Damon Matthew Cheronis
Defendant's Attorney

## THE DEFENDANT:

☐ pleaded guilty to count(s)

☐ pleaded nolo contendere to count(s)          which was accepted by the court.

☒ was found guilty on count(s) one (1), two (2) and five (5) of the Superseding Indictment after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section / Nature of Offense | Offense Ended | Count |
|---|---|---|
| 18:371.F Conspiracy To Defraud The United States | 09/25/2018 | 1s |
| 18:951.F Impersonating Agents Of Foreign Governments | 09/25/2018 | 2s |
| 18:1001.F Statements Or Entries Generally | 09/25/2018 | 5s |

The defendant is sentenced as provided in pages 2 through 5 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☒ The defendant has been found not guilty on count(s) three (3) and four (4) of the Superseding Indictment.

☒ All remaining count(s) are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this District within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States Attorney of material changes in economic circumstances.

January 25, 2023
Date of Imposition of Judgment

Signature of Judge
Ronald A. Guzman, United States District Judge

Name and Title of Judge

February 2, 2023
Date

Case: 1:18-cr-00611 Document #: 409 Filed: 02/03/23 Page 4 of 7 PageID #:1273
ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 2 – Imprisonment
Case: 23-1262     Document: 14     Filed: 07/26/2023     Pages: 108
Judgment – Page 2 of 5

DEFENDANT: JI CHAOQUN
CASE NUMBER: 1:18-CR-00611(1)

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
Sixty (60) months as to count one (1); Sixty (60) months as to count five (5) terms to run concurrently with one another; Ninety-six (96) months as to count two (2) of the Superseding Indictment to run consecutively to Counts (1) and (5) of the Superseding Indictment. Cost Waived.

☒    The court makes the following recommendations to the Bureau of Prisons: West Coast BOP.

☒    The defendant is remanded to the custody of the United States Marshal.

☐    The defendant shall surrender to the United States Marshal for this district:

    ☐    at          on

☐    as notified by the United States Marshal.

☐    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐    before 2:00 pm on

    ☐    as notified by the United States Marshal.

    ☐    as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows: _____

_____

_____

Defendant delivered on _____ to _____ at_____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

DEFENDANT: JI CHAOQUN
CASE NUMBER: 1:18-CR-00611(1)

# MANDATORY CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C § 3583(d)

Upon release from imprisonment, you shall be on supervised release for a term of:
None.

> The court imposes those conditions identified by checkmarks below:

**During the period of supervised release:**

- ☐ (1) you shall not commit another Federal, State, or local crime.
- ☐ (2) you shall not unlawfully possess a controlled substance.
- ☐ (3) you shall attend a public, private, or private nonprofit offender rehabilitation program that has been approved by the court, if an approved program is readily available within a 50-mile radius of your legal residence. [Use for a first conviction of a domestic violence crime, as defined in **§ 3561(b)**.]
- ☐ (4) you shall register and comply with all requirements of the Sex Offender Registration and Notification Act (**42 U.S.C. § 16913**).
- ☐ (5) you shall cooperate in the collection of a DNA sample if the collection of such a sample is required by law.
- ☐ (6) you shall refrain from any unlawful use of a controlled substance AND submit to one drug test within 15 days of release on supervised release and at least two periodic tests thereafter, up to 104 periodic tests for use of a controlled substance during each year of supervised release. [This mandatory condition may be ameliorated or suspended by the court for any defendant if reliable sentencing information indicates a low risk of future substance abuse by the defendant.]

# DISCRETIONARY CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C § 3563(b) AND 18 U.S.C § 3583(d)

**Discretionary Conditions** — The court orders that you abide by the following conditions during the term of supervised release because such conditions are reasonably related to the factors set forth in **§ 3553(a)(1)** and **(a)(2)(B), (C), and (D);** such conditions involve only such deprivations of liberty or property as are reasonably necessary for the purposes indicated in **§ 3553 (a)(2) (B), (C), and (D);** and such conditions are consistent with any pertinent policy statement issued by the Sentencing Commission pursuant to **28 U.S.C. 994a.**
The court imposes those conditions identified by checkmarks below:

**During the period of supervised release:**

- ☐ (1) you shall provide financial support to any dependents if you are financially able to do so.
- ☐ (2) you shall make restitution to a victim of the offense under **§ 3556** (but not subject to the limitation of **§ 3663(a)** or **§ 3663A(c)(1)(A)**).
- ☐ (3) you shall give to the victims of the offense notice pursuant to the provisions of **§ 3555**, as follows:
- ☐ (4) you shall seek, and work conscientiously at, lawful employment or, if you are not gainfully employed, you shall pursue conscientiously a course of study or vocational training that will equip you for employment.
- ☐ (5) you shall refrain from engaging in the following occupation, business, or profession bearing a reasonably direct relationship to the conduct constituting the offense, or engage in the following specified occupation, business, or profession only to a stated degree or under stated circumstances; (if checked yes, please indicate restriction(s))          .
- ☐ (6) you shall not knowingly meet or communicate with any person whom you know to be engaged, or planning to be engaged, in criminal activity and shall not:
  - ☐ visit the following type of places:          .
  - ☐ knowingly meet or communicate with the following persons:          .
- ☐ (7) you shall refrain from ☐ any or ☐ excessive use of alcohol (defined as ☐ having a blood alcohol concentration greater than 0.08; or ☐          ), and from any use of a narcotic drug or other controlled substance, as defined in **§ 102** of the Controlled Substances Act (**21 U.S.C. § 802**), without a prescription by a licensed medical practitioner.
- ☐ (8) you shall not possess a firearm, destructive device, or other dangerous weapon.

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 5 – Criminal Monetary Penalties

Judgment – Page 4 of 5

DEFENDANT: JI CHAOQUN
CASE NUMBER: 1:18-CR-00611(1)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* |
|---|---|---|---|---|
| TOTALS | $300.00 | $.00 | $.00 | $.00 |

☐    The determination of restitution is deferred until        . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐    The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to **18 U.S.C. § 3664(i)**, all nonfederal victims must be paid before the United States is paid.

☐    Restitution amount ordered pursuant to plea agreement $

☐    The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant **to 18 U.S.C. § 3612(f).** All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to **18 U.S.C. § 3612(g).**

☐    The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐    the interest requirement is waived for the        .

☐    the interest requirement for the        is modified as follows:

☐    The defendant's non-exempt assets, if any, are subject to immediate execution to satisfy any outstanding restitution or fine obligations.

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 6 – Schedule of Payments

DEFENDANT: JI CHAOQUN
CASE NUMBER: 1:18-CR-00611(1)

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A ☒ Lump sum payment of $300.00 due immediately.

     ☐ balance due not later than     , or

     ☐ balance due in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

B ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

C ☐ Payment in equal    *(e.g. weekly, monthly, quarterly)* installments of $    over a period of    *(e.g., months or years)*, to commence    *(e.g., 30 or 60 days)* after the date of this judgment; or

D ☐ Payment in equal    *(e.g. weekly, monthly, quarterly)* installments of $    over a period of    *(e.g., months or years)*, to commence    *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

E ☐ Payment during the term of supervised release will commence within    *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number Defendant and Co-Defendant Names (including defendant number) | Total Amount | Joint and Several Amount | Corresponding Payee, if Appropriate |
|---|---|---|---|

**See above for Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.**

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| Plaintiff, | ) | No. 18 CR 611 |
| | ) | |
| v. | ) | Judge Ronald A. Guzmán |
| | ) | |
| Ji Chaoqun, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

For the reasons stated below, Defendant's motions for judgment of acquittal [377] and for a new trial [378] are denied.

## STATEMENT

On May 19, 2022, the grand jury returned a five-count superseding indictment charging Defendant with one count of engaging in a conspiracy to violate the laws of the United States in violation of 18 U.S.C. § 371 (Count One), one count of failing to register as a foreign agent in violation of 18 U.S.C. § 951(a) (Count Two), two counts of wire fraud in violation of 18 U.S.C. § 1343 (Counts Three and Four), and one count of making a false statement in violation of 18 U.S.C. § 1001(a)(2) (Count Five). After a September 2022 jury trial, the jury returned a verdict of not guilty as to the wire-fraud counts (Counts Three and Four) and a guilty verdict as to Counts One, Two, and Five. In ruling on Defendant's post-trial motions, the Court assumes knowledge of the facts of the case, the evidence presented during trial, and the Court's prior rulings. The Court addresses the issues in the order presented by the parties.

## Motion for Judgment of Acquittal

Under Federal Rule of Criminal Procedure 29, where "the evidence presented at trial is insufficient to support a conviction, a district court must enter judgment of acquittal either after the government has closed its evidence or after a jury has rendered a verdict or been discharged." *United States v. Moreno*, 922 F.3d 787, 793 (7th Cir. 2019) (internal quotation marks omitted). In reviewing a motion for judgment of acquittal, the district court must "view the evidence in the light most favorable to the government and draw all reasonable inferences in the government's favor." *Id.* (internal quotation marks omitted). Furthermore, "any challenge to the sufficiency of the evidence comes with a heavy, indeed, nearly insurmountable burden" and courts will "reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation marks omitted).

A.     Count Two

As to Count Two of the superseding indictment, Defendant was convicted of violating 18 U.S.C. § 951, which makes it a crime to knowingly act as an agent of a foreign government without prior notification to the Attorney General. The government's evidence in support of this count, i.e., Defendant's "actions," were (1) the purchase and transfer of background reports; (2) a January 20, 2014 email conversation with Defendant's friend, Yu Wenzhi, and (3) Defendant's application to the FBI Honors Internship Program.

Background Reports. Defendant contends that the purchase and transfer of the background reports falls under the legal commercial transaction exception in § 951 because the purchase of the reports was "100% legal," Xu Yanjun's request for the reports was characterized as a "favor" so Defendant's purchase and transmission of the reports was not undertaken in his capacity as an unregistered foreign agent, and the timing of Xu's request indicates that it was "a test in order to bring [Defendant] into the fold, not the qualifying action of an already committed participant." (Def.'s Mot. Acquittal, Dkt. # 377, at 5.) The Court has already rejected Defendant's attempted reliance on the legal commercial transaction exception (Dkt. # 368) and can discern no basis on which to revisit its ruling.

The Court also rejects Defendant's assertion that Xu's request for background reports was only a "favor" and thus falls outside the parameters of the statute. While Xu stated he was asking Defendant for a favor, the jury also heard that Xu directed Defendant to "query information" about certain people and send the reports to Xu's QQ account in a compressed, password-protected format. Xu further directed Defendant to bill him for the costs. Viewing the evidence in a light most favorable to the government, the jury's finding that Defendant's purchase and transmission of the reports fell within § 951 is supported by the evidence, particularly in light of James Olson's expert testimony that Xu's request for the background reports was an order that Defendant was obligated to satisfy.

Nor is the Court convinced by Defendant's argument that the purchase and sale of the reports was just a "test" that fell "prior to" the three-year "window" of time in which Defendant was given to consider whether to join the MSS. According to Defendant, he had until July 2016 to indicate whether he was going to join the MSS and because the purchase and sale of the background reports occurred before that date, the conduct could not have been considered as having been undertaken at the direction of the MSS. Even assuming Defendant's text messages with his then-girlfriend support a finding that he had three years from July 2013 to indicate whether he was joining the MSS, the jury was entitled to find that Defendant made the decision to do so when he complied with Xu's directive to purchase the background reports in August 2015, particularly given the government's evidence that Defendant was given the MSS registration form and $6,000.00 cash in January 2014. Furthermore, Defendant need not have made a decision to "join" the MSS as a permanent operative, as the registration form required, in order to agree to commit a specific act or acts under the direction of the MSS in violation of § 951.

Yu Wenzhi Conversation, FBI Honors Internship Application, and Joining the Army. Defendant asserts that because the MSS registration form required Defendant to keep secret the PRC's intelligence work, Defendant could not have been acting in his capacity as an unregistered

2

foreign agent by disclosing his involvement with the MSS to Yu Wenzhi, particularly in a "bragging, joking, and teasing manner." (Def.'s Mot. J. Acquittal, Dkt. # 377, at 5). Defendant further argues that there is no evidence that the PRC government instructed, demanded, or requested Defendant to make the revelations to Yu Wenzhi, apply to the FBI Honors Internship Program, or join the Army.

The jury heard evidence that Defendant sent a photo of the MSS registration form to Yu Wenzhi and asked him to identify other students in aircraft engineering or design who might be of assistance to the MSS and PRC. Joseph McReynolds testified on behalf of the government that aviation and aerospace technology has been a "major focus" of China's industrial espionage. (Tr. at 97.) In the text messages the jury saw between Defendant and his then-girlfriend, Defendant indicated that he was asked to write an article of his "understanding of the Science and Technology intelligence work" and his "takeaway from the training." Defendant's assertion that certain of Defendant's particular acts were not expressly directed by the MSS is unpersuasive. *See United States v. Rafiekian*, 991 F.3d 529, 540 (4th Cir. 2021) ("The line between an 'agent' who works under a foreign government's 'control' and one who, instead, agrees to operate subject to a more hands-off form of 'direction'—as an agent-independent contractor could—might be a hazy one. Still, we find no reason to believe that Congress sought to exclude the latter variety of agency from § 951's reach."). The jury was entitled to conclude that by soliciting Yu Wenzhi's help in recruiting potential future agents or sources of information, Defendant was acting at the direction of the MSS. Further, while Defendant may have violated his oath of secrecy by forwarding the photograph of the registration form, as James Olson testified, simply because an agent does something "stupid" does not make him less of an agent. (Tr. at 650); *see United States v. Angwang*, No. 20-CR-442(EK), 2022 WL 3223187, at *2 (E.D.N.Y. Aug. 8, 2022) ("Section 951(a) does not require that an 'agent' be effective or successful, or that he act out of any particular motive--only that he be subject to a foreign government's 'direction or control.'").

The Court reaches the same conclusion with respect to Defendant's application to the FBI Honors Internship Program. While the government did not present evidence that Defendant had been specifically directed to fill out the application, the jury heard Defendant tell the FBI undercover employee that Defendant could "get FBI stuff" if he was "able to apply for its open positions" and that he wanted to "get in" the FBI to be able to access its database. (Tr. at 877.) The government presented sufficient evidence for the jury to conclude that Defendant's application to the Honors Internship Program was done at the direction of the MSS. *See United States v. Latchin*, 554 F.3d 709, 715 (7th Cir. 2009) ("There may not have been direct evidence of acts on behalf of Iraq, but the circumstantial evidence was strong. In addition to receiving sums of money from IIS personnel at international locations, Latchin placed 39 phone calls to IIS agent "Khalil"— second in command of the sleeper program—in Baghdad between June 2001 and May 2004. It's hard to believe that Latchin was just calling to chat, or that this was all done in connection with his IIS "pension plan." Whether Latchin actually spied on Iraqi Christians in the United States may be another matter altogether. But the jury did not have to find that he did to convict him under § 951.").[1]

---

[1] Similarly, the jury heard evidence that Defendant had numerous communications with and received sums of cash from members of the MSS and joined the Army in order to aid the MSS.

As for joining the Army, the government presented evidence that Defendant told the undercover FBI employee that Defendant had informed the MSS that he had joined the Army. (Tr. at 712) (in speaking to the undercover employee, Defendant states, "I need to attend to [Army] training in a minute. Nanjing people should know that, too.") Based on the evidence elicited at trial, the reference to "Nanjing people" is a reference to Defendant's MSS contacts. Defendant further told the undercover employee that by doing so, he could obtain citizenship faster, would be allowed admission onto Army bases, and could procure security clearances and "apply for all kinds of jobs, such as NASA, etc." (*Id.* at 879.) It is not the Court's province to reconsider the jury's reasonable conclusion from the evidence evinced that Defendant was acting as an agent of the MSS in joining the Army.

The motion for judgment of acquittal as to Count Two is denied.

B.      Count One

Count One of the superseding indictment charged Defendant with conspiracy to violate 18 U.S.C. § 951. Defendant contends that he "did nothing at the direction and control of any of the [MSS] officers." (Def.'s Motion J. Acquittal, Dkt. # 377, at 7.) According to Defendant, the government's evidence showed that "aside from sporadic holiday greetings, [Defendant] lost contact with Mr. Geng and Mr. Zha nearly entirely"; "by independently joining the MAVNI program, given its requirement of limited significant absences from the United States, [Defendant] positioned himself in a situation where he was unable to have face-to-face contact"; and he never told Xu about the Yu Wenzhi conversation or the FBI application and "even lied to [Xu] about being employed [with] Motorola." (*Id.*)

The evidence presented at trial, including the conduct discussed in the previous sections of this order, contradicts Defendant's contention that he committed no acts at the direction of the MSS. Moreover, as the government notes, to be convicted of conspiracy, Defendant did not have to take any acts at the direction of the MSS, he only had to agree to do so. Defendant's registration as an MSS agent, including his oath of lifelong loyalty to the MSS, is sufficient evidence from which the jury could conclude that Defendant agreed to knowingly act as an agent of the PRC. In addition, the relevant overt acts could have been taken by any member of the conspiracy (i.e., Xu's messages to Defendant to purchase the background reports), not just Defendant.

The motion for judgment of acquittal as to Count One is denied.

C.      Count Five

Count Five of the superseding indictment charged Defendant with making a false statement to the federal government by lying on his SF-86 form to the U.S. Army regarding his contacts with a foreign government; the jury convicted him of this count. Defendant asserts that "it is not even clear if [he] filled out the SF-86, and the government's own evidence suggests the opposite conclusion." (*Id.* at 8.) The government presented testimony from Sergeant Andrew Crandall, who conducted Defendant's MAVNI interview, that Crandall understood from Defendant's responses to Crandall's questions that Defendant filled out the MAVNI forms, and that they were only reviewed (not filled out) by Defendant's recruiter. (Tr. at 1488-89.) In addition, Kendra

Martin, who reviewed Defendant's SF-86 for the U.S. Army, testified that she could usually tell if a recruiter filled out the program form for a recruit and that "there was no indication . . . from [Defendant]—that he did not fill out this form." (*Id.* at 1658.) In any event, Defendant certified that his statements, even if written by someone else, were true, complete, and correct (which, of course, they were not) and that a willful false statement could be punished by fine or imprisonment.

Defendant's motion for judgment of acquittal on Count Five is denied.

## Motion for a New Trial

Under Rule 33, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The rule is 'reserved for only the most extreme cases,'" and the Court "'approach[es] such motions with great caution and [is] wary of second-guessing the determinations of both judge and jury.'" *United States v. Hagler*, 700 F.3d 1091, 1101 (7th Cir. 2012) (citations omitted).

A.     Denial of Motion to Dismiss Count One on Multiplicity Grounds

This issue was initially raised in one of Defendant's pretrial motions, which the Court denied. "Multiplicity is the charging of a single offense in separate counts of an indictment." *United States v. Starks*, 472 F.3d 466, 468-69 (7th Cir. 2006). "Multiplicity in an indictment exposes a defendant to the threat of receiving multiple punishments for the same offense in violation of the Double Jeopardy Clause of the Fifth Amendment." *Id.* at 469. According to Defendant, an agreement is already incorporated into the elements of the § 951 charge because the definition of "agent of a foreign government" is one who agrees to act at the direction or control of the foreign government. Thus, Defendant asserts, because a conspiracy is "in essence a criminal agreement," (Def.'s Mot. J. Acquittal, Dkt. # 378, at 3), the elements of the substantive § 951 charge and the conspiracy charge merge and become multiplicitous. Defendant further asserts that the "problem is exacerbated [here] given that the only facts alleged in the 'speaking' indictment spoke directly to the purchase and transfer of the background reports," (*id.*), and no other acts, yet the government argued additional acts at trial. According to Defendant, "[h]ad the jury been told that it was required to make additional factual findings to cure any [multiplicity] issue—such as facts alleged as part of the conspiracy that would have made the conspiracy charged and found to be proven in [C]ount [O]ne something other than simply the purchase and transfer of the background reports . . . the problem could have been potentially remedied or at least mitigated." *Id.* Defendant asks the Court to vacate the judgment of conviction as to Counts One and Two.

"The traditional test of multiplicity determines whether each count requires proof of a fact which the other does not." *Starks*, 472 F.3d at 469. "If one element is required to prove the offense in one count which is not required to prove the offense in the second count, there is no multiplicity." *Id.* Here, as the government notes, § 951 required that Defendant himself "act" while the conspiracy count required only an action by a co-conspirator.[2] *See United States v.*

---

[2]  Moreover, the Court notes that "'[a]iding and abetting liability and *Pinkerton* liability—under which defendants are held responsible for foreseeable acts taken in furtherance of the conspiracy by their co-conspirators—are always alternate theories under which a defendant may be convicted

*Duran*, 407 F.3d 828, 835 (7th Cir. 2005) ("'[W]here there is one agreement, a defendant who agrees to conspire will be held liable for those acts of co-conspirators that were in furtherance of the conspiracy . . . . even if the acts in furtherance of the conspiracy were committed before the defendant/co-conspirator joined the conspiracy; even if the defendant/co-conspirator did not know the person performing the acts that furthered the conspiracy, and . . . even if the defendant/co-conspirator did not know specifically that the acts were going to be performed.'") (citations omitted). In light of the law of conspiracy, Defendant's contention that under the facts of this case, the conspiracy alleged "was co-extensive in all material respects with the [§ 951 count]" and must be dismissed as multiplicitous is without merit. In addition, Defendant's acts supporting the § 951 conviction were done by him at the direction of Xu, while Count Two addressed Defendant's participation in a conspiracy not just with Xu but also other members of the MSS, including Zha and Geng. Accordingly, Defendant's motion for a new trial on multiplicity grounds is denied. *See United States v. Dumeisi*, 424 F.3d 566 (7th Cir. 2006) (affirming a conviction for a substantive violation of § 951 and a § 371 conspiracy to violate § 951).

B.     Denial of Defendant's Motion to Dismiss Count Two

On June 4, 2021, the Court denied Defendant's motion to dismiss Count Two, the § 951 charge, in which Defendant argued that the indictment should be dismissed because of defects in the grand-jury presentation, the indictment's failure to allege venue or a qualifying act, and the indictment's failure to exclude legal commercial transactions. The Court denied the motion. Defendant asserts that the motion was improperly denied and asks the Court to vacate his conviction on Count Two but presents no new reasoning. The Court denies the motion for the reasons stated in its order of June 4, 2021. (Dkt. # 141.)

C.     Granting of the Government's Motion to Bar the Legal Commercial Transaction Defense

Defendant asserts that the Court's granting of the government's motion to bar the legal commercial transaction defense to § 951 deprived him of his ability to present a defense, assumed until the verdict was returned that he was a spy, and was based on an incorrect reading of the statute. The Court explained its reasons for granting the government's motion to bar in its September 22, 2022 order, (Dkt. # 368), and Defendant identifies no basis on which the Court should revisit its decision. This request for relief is denied.

D.     Denial of Defendant's Motion Regarding Purported Constructive Amendment of the Superseding Indictment

Defendant contends that in proving the § 951 charge, it was improper for the government to rely on acts other than the one identified in the original and superseding indictments (i.e., the purchase and transfer of commercial background reports). Defendant takes issue with the government stating for the first time less than one month before trial that it also would be relying on Defendant's January 20, 2014 email communication with Yu Wenzhi and Defendant's 2015

---

of a charged offense at trial, and neither must be alleged in the indictment.'" *United States v. Agee*, No. 119CR00103TWPDLP, 2019 WL 6213166, at *8 (S.D. Ind. Nov. 21, 2019) (citation omitted).

FBI Honors Internship application as "acts" supporting the § 951 charge. Then, at trial, the government also included Defendant's purchasing the fake Findream job and joining the Army.[3]

"'A constructive amendment of an indictment occurs when the evidence at trial goes beyond the parameters of the indictment in that it establishes offenses different from or in addition to those charged by the grand jury.'" *United States v. Shields*, 789 F.3d 733, 742 (7th Cir. 2015) (citation omitted). "'[N]ot all variations in proof that contradict or supplement verbiage in the indictment rise to the level of constructive amendments.'" *United States v. Phillips*, 745 F.3d 829, 832 (7th Cir. 2014) (citation omitted). "Instead, the crime charged in the indictment must be 'materially different or substantially altered at trial, [so that] it is impossible to know whether the grand jury would have indicted for the crime actually proved.'" *Id.* (citation omitted and alteration in *Phillips*). As an initial matter, the charging language used in Count Two broadly refers to unspecified acts between August 28, 2013 and September 25, 2018, a period of over five years. Moreover, that evidence of additional acts elicited at trial was not presented to the grand jury does not alter the Court's conclusion that no constructive amendment occurred because not every fact in support of the government's case must be presented to the grand jury. *See United States v. Walker*, 207 F. App'x 673, 676 (7th Cir. 2006) ("[Defendant] points to the fact that the wiretap evidence was never presented to the grand jury. This, of course, is of no consequence, as the burden of proof at trial frequently requires the presentation of more evidence than was presented to a grand jury. The fact that testimony at trial was not presented to the grand jury does not make an otherwise valid indictment constitutionally infirm."). Moreover, Count Two's incorporation of Count One's language does not necessarily restrict the government to presenting evidence of the acts discussed in Count One. *See United States v. Tello*, 687 F.3d 785, 795 (7th Cir. 2012) (rejecting constructive amendment and noting that while "the opening paragraph of Count Two incorporated by reference the allegations of Count One, the substantive section 1962(c) charge, . . . that boilerplate did not by itself alter the nature of Count Two's conspiracy charge to demand proof that [the defendant] committed any of the specific predicate acts set forth in Count One.")

Defendant refers in a footnote to an "additional layer of concern" because an FBI agent testified before the grand jury that Defendant was not expressly directed by the MSS to join the U.S. Army. (Def.'s Mot. J. Acquittal, Dkt. # 378, at 6 n.3.)[4] In his reply, Defendant clarifies that the "'added layer of concern' the grand jury testimony presents is that it demonstrates the government's knowledge and awareness of the fact that joining the Army could not legally be used

---

[3] It is worth noting that all of the government's "acts" evidence at trial was included in the government's pretrial disclosures to Defendant.

[4] Defendant points to the following exchange with the FBI agent before the grand jury:

> Q: In addition to what you testified about previously, is it true that during this meeting that Ji explained that it was, in fact, his idea to join the Army via the MAVNI program because it was the fastest way to obtain citizenship in the United States?
> A: Yes.
> Q: So he was not directed to do that by his intelligence officer handlers, is that right?
> A: Correct.

(Def.'s Reply, Dkt. # 382, at 4.)

for purposes of [the § 951] count . . . , yet it chose to argue that point to the jury and attempt to persuade it to use it as a qualifying 'act,' even though it was well aware it could not properly do so." (Def.'s Reply, Dkt. # 382, at 4.) For the reasons stated above in the discussion on Defendant's motion for judgment of acquittal on Count Two, the Court disagrees with Defendant's contention that the agent's grand-jury testimony precluded the government from arguing to the jury that Defendant "acted" at the behest of the MSS for purposes of § 951 when he joined the MAVNI program. To the extent Defendant is arguing an error before the grand jury, "any alleged federal constitutional error during the charging and grand jury process would be harmless because [Defendant] was found guilty beyond a reasonable doubt at trial." *Watkins v. Garnett*, No. 19 C 2878, 2022 WL 4465712, at *3 (N.D. Ill. Sept. 26, 2022).

Defendant's assertion of error based on a purported constructive amendment is denied.

E.     Denial of Evidence and Testimony Concerning the Nature of the PRC and the MSS

It appears that Defendant may be asserting error based on the Court's preclusion of a defense that he was manipulated and deceived by the PRC. (Def.'s Mot. J. Acquittal, Dkt. # 378, at 7-8) ("The defense . . . was that [Defendant] would not have known and appreciated the full nature of the situation he was becoming involved in—at least not until sometime during his second trip back to China. And going forward from this point, when the "big reveal" occurred, over the remaining four or so years of the conspiracy, he did not do anything for the MSS. . . . [and] all but lost contact with the intelligence officers outside of sporadic holiday greetings, and transfer of the commercial background reports."). Defendant then states that "[p]roving how the PRC functions and operates in this context was therefore critical to the defense." *Id.* at 8.

The government interprets Defendant's motion to be asserting error with respect to the Court's excluding the testimony of Defendant's proposed expert, Donald Clarke, who would have testified, among other things, that "PRC black-letter law expressly requires Chinese citizens to cooperate and assist in national intelligence work when asked." (Gov't's Resp. Def.'s Mot. J. Acquittal, Dkt. # 381, at 6) (citing Def.'s Mot. J. Acquittal, Dkt. # 378, at 8). The Court fully addressed Defendant's arguments as to Professor Clarke's proposed testimony in its August 3, 2022 order, (Dkt. # 311), and Defendant offers no basis to revisit that ruling. This basis for relief is denied.

Defendant also argues that he was improperly precluded from asking the government's expert, Joseph McReynolds, "specific questions regarding the PRC's formal programs to repatriate overseas citizens through the use of deception, coercion, and the threat of force, violence, and the other sanctions." (Def.'s Mot. J. Acquittal, Dkt. # 378, at 8.) Defendant points to no evidence regarding repatriation or a threat of repatriation in this case; the Court finds no error in excluding questions on an irrelevant topic. Defendant also asserts that he should have been permitted to ask Special Agent Bradley Hull and James Olson about MSS members' "efforts to further their various agendas, often through subterfuge, deception, manipulation and the like." (*Id.*) "A defendant is entitled to a new trial only if there is a reasonable possibility that the trial error had a prejudicial effect on the jury's verdict." *United States v. Flournoy*, 842 F.3d 524, 530 (7th Cir. 2016). Even assuming it was error to exclude Professor Clarke's testimony or preclude Defendant from questioning witnesses regarding the MSS's tactics regarding deception and subterfuge, the Court

finds it did not have a prejudicial effect on the jury's verdict. The evidence at trial, including Defendant's boastful January 20, 2014 email conversation with his friend, Yu Wenzhi, and his 2013 WeChat messages to his then-girlfriend, Beatrice (discussed below), clearly demonstrated that Defendant understood at some point in time that Xu, Geng, and Zha were members of the MSS, and he willingly carried out tasks on its behalf, including purchasing background reports and recruiting potential sources of scientific and technical information.

    F.    Denial of Defendant's Motion to Exclude Late-Discovered Exhibits

In a written ruling issued September 21, 2022 (Dkt. # 365), the Court overruled Defendant's objection to the government's introducing late-disclosed WeChat messages, purportedly between Defendant and his then-girlfriend, Beatrice, from July and August 2013. (Gov't Exs. 314, 314T, 315, 315T, 316, 316T, 317, and 318). Defendant asserts that "for all the reasons previously argued and discussed, and as has been further argued," the Court erred in allowing the government to admit the messages because the ruling constituted an abuse of discretion and violated Defendant's right to a fair trial, and the late disclosure violated Federal Rule of Criminal Procedure 16.

For all the reasons contained in the Court's September 21, 2022 order, Defendant's assertion of error is rejected. The Court concluded there was no Rule 16 violation because the government made the appropriate disclosures to Defendant long before the WeChat messages were added to the government's list of trial exhibits. The defense knew since sometime in 2019 of the existence of the WeChat messages, which directly undermined any argument that Defendant was tricked into or was otherwise unaware of the fact that he was being solicited by the MSS. Defendant nevertheless chose to include this assertion in his defense. That the government would respond with contrary evidence could not have been a surprise. Even assuming the late amendment to the government's trial exhibits somehow undermined Defendant's initial argument to the jury that Defendant did not know who the MSS officers were when Defendant was originally courted by the MSS, Defendant had access to the same WeChat messages.[5] As the Court noted, because Defendant speaks Mandarin, "the information was more readily available to defense counsel than it was to the government." (9/21/22 Order, Dkt. # 365, at 3).

In any event, the evidence clearly showed that at some point (at least as early as July 2013), Defendant knew he was dealing with MSS members. Defendant does not specifically identify how admission of the exhibits denied him his due process rights or his right to a fair trial or undermined the interests of justice. Defendant's motion for a new trial based on the Court's overruling his objection to the admission of the WeChat messages is therefore denied. *See United States v. Isaacs*, 593 F.3d 517, 527 (7th Cir. 2010) (district court did not abuse its discretion by admitting government's summary exhibits when the government turned over a new set of CDs containing underlying data three days before trial because "the government produced [an] earlier set of CDs containing the underlying data used to create the summary exhibits to [the defendant] in 2006," so the defendant "had at least fifteen months to review the data and compare it to the summary exhibits to determine if there were any inaccuracies").

---

[5] Indeed, the government's initial failure to designate the emails as exhibits stemmed in part from its difficulty in obtaining translations of voluminous materials from Mandarin to English.

For the reasons provided, Defendant's motions for judgment of acquittal and for a new trial are denied.

**Date:**  January 5, 2023

*Ronald A. Guzmán*

**Ronald A. Guzmán**
**United States District Judge**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

United States of America,

        Plaintiff,

        v.

Ji Chaoqun,

        Defendant.

)
)
)
)
)
)
)
)

No. 18 CR 611

Judge Ronald A. Guzmán

### ORDER

Defendant seeks to preclude evidence or argument regarding the "act" element of Count Two. Specifically, Defendant asks the Court to bar the government from proffering evidence or argument regarding an alleged January 20, 2014 conversation between Defendant and individual Y.W., and Defendant's application to the FBI Honors Talent Internship Program.[1] (Dkt. # 342, at 1.) According to Defendant, evidence or arguments regarding these two acts should be precluded because they were never presented to the grand jury, not referenced in the superseding indictment, and not argued or discussed in prior filings, including the *Santiago* proffer. Defendant states that allowing the government to present these two pieces of evidence would constructively amend the superseding indictment. The Court assumes knowledge of the background facts and procedural history of the case.

Count Two of the Superseding Indictment states as follows:

1. Paragraph 1 of Count One is incorporated here.

2. From on or about August 28, 2013 to on or about September 25, 2018, at Chicago, in the Northern District of Illinois, and elsewhere,

        JI CHAOQUN,

defendant herein, did knowingly act in the United States as an agent of a foreign government, namely the People's Republic of China, without prior notification to the Attorney General, as required by law;

---

[1] Defendant's motion appears to be in response to the government's motion to exclude the legal-commercial-transaction affirmative defense (Dkt. # 329). In that motion, the government argues that Defendant should be precluded from relying on the defense because in addition to the background reports, the government will also present evidence of the January 20, 2014 conversation and the Honors Talent Internship application as "acts" supporting the charge under 18 U.S.C. § 951.

In violation of Title 18, United States Code, Section 951(a).

(Dkt. # 283, at 6.)

"'A constructive amendment of an indictment occurs when the evidence at trial goes beyond the parameters of the indictment in that it establishes offenses different from or in addition to those charged by the grand jury.'" *United States v. Shields*, 789 F.3d 733, 742 (7th Cir. 2015) (citation omitted). The trial has not yet occurred, so the constructive amendment argument is premature. *United States v. Zajac*, No. 10 CR 376, 2021 WL 5050298, at *3 (N.D. Ill. Nov. 1, 2021) ("[U]ntil there has been a trial and an error has been committed, Defendant has no basis for his constructive amendment argument."). Accordingly, Defendant's motion to preclude evidence or argument regarding the January 20, 2014 conversation and the Honors Talent Internship application is denied without prejudice as premature.

The Court further notes that "'not all variations in proof that contradict or supplement verbiage in the indictment rise to the level of constructive amendments.'" *United States v. Phillips*, 745 F.3d 829, 832 (7th Cir. 2014) (citation omitted). "Instead, the crime charged in the indictment must be 'materially different or substantially altered at trial, [so that] it is impossible to know whether the grand jury would have indicted for the crime actually proved.'" *Id.* (citation omitted and alteration in *Phillips*). The charging language used in Count Two broadly refers to unspecified acts between August 28, 2013 and September 25, 2018. Moreover, not every fact in support of the government's case must be presented to the grand jury. *See United States v. Walker*, 207 F. App'x 673, 676 (7th Cir. 2006) ("[Defendant] points to the fact that the wiretap evidence was never presented to the grand jury. This, of course, is of no consequence, as the burden of proof at trial frequently requires the presentation of more evidence than was presented to a grand jury. The fact that testimony at trial was not presented to the grand jury does not make an otherwise valid indictment constitutionally infirm."). Finally, Count Two's incorporation of Count One's language does not necessarily restrict the government to presenting evidence of the acts discussed in Count One. *See United States v. Tello*, 687 F.3d 785, 795 (7th Cir. 2012) (rejecting constructive amendment and noting that while "the opening paragraph of Count Two incorporated by reference the allegations of Count One, the substantive section 1962(c) charge, . . . that boilerplate did not by itself alter the nature of Count Two's conspiracy charge to demand proof that [the defendant] committed any of the specific predicate acts set forth in Count One.").

**Date**: September 9, 2022

*Ronald A. Guzmán*

**Ronald A. Guzmán**
**United States District Judge**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| Plaintiff, | ) | |
| | ) | No. 18 CR 611 |
| v. | ) | |
| | ) | Judge Ronald A. Guzmán |
| Ji Chaoqun, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

For the reasons stated below, Defendant's second motion to dismiss Count Two of the indictment [140] is denied.

## STATEMENT

The Court assumes familiarity with the procedural history and facts of this case. Briefly, on January 24, 2019, the grand jury returned a six-count indictment charging Defendant with one count of engaging in a conspiracy to violate the laws of the United States in violation of 18 U.S.C. § 371; one count of failing to register as a foreign agent in violation of 18 U.S.C. § 951(a); three counts of wire fraud in violation of 18 U.S.C. § 1343; and one count of making a false statement in violation of 18 U.S.C. § 1001(a)(2).

For the second time[1], Defendant moves to dismiss Count Two under 18 U.S.C. § 951(a), failing to register as a foreign agent. Count Two states as follows:

1.  Paragraph 1 of Count One is incorporated here.[2]

---

[1] Defendant's first motion to dismiss this count argues that the indictment did not fairly inform him of the nature of the charge by failing to specify the "act" he allegedly undertook on behalf of the Chinese government. The Court denied the motion. (Dkt. # 90, at 8.)

[2] Paragraph one of Count One states:

1.  At times material to this indictment:

    a.  JI CHAOQUN was a citizen of the People's Republic of China.
    b.  On or about August 28, 2013, JI CHAOQUN arrived in the U.S. on a visa.
    c.  The Ministry of State Security ("MSS") was the intelligence and security agency for the People's Republic of China, and was responsible for counterintelligence, foreign intelligence, and political security. The Jiangsu Province Ministry of State Security ("JSSD") was a regional foreign intelligence arm of the MSS, headquartered in Nanjing, China.

2.   From on or about August 28, 2013 to on or about September 25, 2018, at Chicago, in the Northern District of Illinois, and elsewhere, JI CHAOQUN, defendant herein, did knowingly act in the United States as an agent of a foreign government, namely the People's Republic of China, without prior notification to the Attorney General, as required by law;
In violation of Title 18, United States Code, Section 951(a).

(Indictment, Dkt. # 32, at 6.)

"An indictment must: (1) state the elements of the offense charged; (2) fairly inform the defendant of the nature of the charge so that he may prepare a defense; and (3) enable the defendant to plead an acquittal or conviction as a bar against future prosecutions for the same offense." *United States v. Khan*, 937 F.3d 1042, 1049 (7th Cir. 2019). "[A]n indictment need not 'spell out each element' as long as 'each element [is] present in context.'" *Id.* (citation omitted). "An implicit allegation of an element of a crime is enough; the indictment 'need not specifically allege' every 'component part of the offense.'" *Id.* at 1049-50 (citation omitted). Moreover, "it is not necessary for an indictment to allege in detail the factual proof that will be relied on to support the charges." *United States v. Smith*, 230 F.3d 300, 306 (7th Cir. 2000).

Count One of the indictment, paragraph one of which is expressly incorporated into Count Two, provides the factual basis of the charge against Ji.  Count One states:

2.   Beginning no later than on or about August 28, 2013, to on or about September 25, 2018, at Chicago, in the Northern District of Illinois, and elsewhere, JI CHAOQUN, defendant herein, conspired with Intelligence Officer A and others known and unknown to the Grand

---

d.   Intelligence Officer A, a resident of the People's Republic of China, was the Deputy Division Director of the Sixth Bureau of the JSSD.
e.   The Military Accessions to Vital National Interest ("MAVNI") Program authorized the United States Army to recruit individuals who were not United States citizens[] but were legally present in the United States.  If a recruit met the MAVNI requirements, including passing a full single-scope background investigation and the 10-week Basic Combat Training course, the recruit's application to become a U.S. citizen was expedited without first obtaining lawful permanent residence.
f.   Absent a lawful exception, individuals who agreed to operate within the United States subject to the direction and control of a foreign government were required to provide prior notification to the Attorney General.
g.   Companies A, B, and C were United States-based companies that offered certain services for United States-based consumers, such as the purchase of background reports on individuals.  These reports would typically include information that included an individual's education and employment history.

(Indictment, Dkt. # 32, ¶ 1.)

Jury to commit an offense against the United States, namely, to knowingly act in the United States as an agent of a foreign government, namely, the People's Republic of China, without prior notification to the Attorney General of the United States as required by law, in violation of Title 18, United States Code, Section 951(a).

3. It was a part of the conspiracy that JI CHAOQUN agreed to assist Intelligence Officer A and the People's Republic of China by covertly serving as an agent of the People's Republic of China while residing in the United States.

4. It was further part of the conspiracy that in 2013 and 2014, JI CHAOQUN traveled from Chicago to Beijing, China to meet with Intelligence Officer A.

5. It was further part of the conspiracy that during JI CHAOQUN's trips to the People's Republic of China in 2013 and 2014, he met with Intelligence Officer A for the purpose of discussing and planning JI CHAOQUN's role as an agent of the People's Republic of China.

6. It was further part of the conspiracy that while in the United States, JI CHAOQUN communicated with Intelligence Officer A, including by email and text message.

7. It was further part of the conspiracy that Intelligence Officer A instructed JI CHAOQUN to obtain from Companies A, B, and C background reports of multiple individuals in order to circumvent restrictions set by Companies A, B, and C on purchases made outside of the United States.

8. It was further part of the conspiracy that while in the United States, JI CHAOQUN purchased and obtained background reports requested by Intelligence Officer A of certain naturalized United States citizens, who were born in Taiwan or China and worked in the United States at companies in the science and technology industry, including cleared United States defense contractors.

9. It was further part of the conspiracy that JI CHAOQUN emailed the background reports to Intelligence Officer A in a manner that disguised the true nature of the reports and that Intelligence Officer A was the intended recipient of the email and background reports.

10. It was further part of the conspiracy that JI CHAOQUN was provided money by Intelligence Officer A as compensation and to reimburse JI CHAOQUN for expenses JI CHAOQUN incurred in obtaining the background check reports.

11. It was further part of the conspiracy that JI CHAOQUN joined the
United States Army as a means to obtain United States citizenship via
the MAVNI program and to gain access to sensitive and classified
information for the People's Republic of China.

12. It was further part of the conspiracy that JI CHAOQUN concealed,
misrepresented, and hid and caused to be concealed, misrepresented,
and hidden, the existence and purpose of the conspiracy and the acts
done in furtherance of the conspiracy.

13. In furtherance of the conspiracy and to effect its objects and purposes,
JI CHAOQUN committed and caused to be committed the following
overt acts, among others, within the Northern District of Illinois and
elsewhere:

a. Between on or about December 9, 2013, and on or about July 6,
2014, JI CHAOQUN traveled between Chicago and Beijing, China
on multiple occasions.
b. On or about December 18, 2013, JI CHAOQUN and Intelligence
Officer A met in China.
c. On or about January 10, 2014, JI CHAOQUN and Intelligence
Officer A met in China.
d. From on or about August 25, 2015, through on or about August
31, 2015, Intelligence Officer A and JI CHAOQUN exchanged text
messages in which Intelligence Officer A directed JI CHAOQUN
to send Intelligence Officer A the background reports.
e. On or about August 30, 2015, while he was in the United States, JI
CHAOQUN purchased background reports from Companies A, B, and
C.
f. On or about August 30, 2015, JI CHAOQUN made the background
check information available to Intelligence Officer A in an email
addressed to a third party.
g. On or about September 18, 2015, while he was in the United
States, JI CHAOQUN purchased a background report from
Company A.
h. On or about September 18, 2015, JI CHAOQUN made background
check information available to Intelligence Officer A in an email
addressed to a third party.

All in violation of Title 18, United States Code, Section 371.

(Indictment, Dkt. # 32, ¶¶ 2-13.)

As Ji notes, § 951 "requires *acts* as an agent on behalf of a foreign country." *United
States v. Latchin*, 554 F.3d 709, 715 (7th Cir. 2009) (emphasis in original). Ji insists that the

4

indictment fails to plead the alleged prohibited acts under § 951 with the necessary sufficiency. The Court disagrees. "[T]he sufficiency of an indictment is to be reviewed practically, with a view to the indictment in its entirety, rather than in any 'hypertechnical manner.'" *United States v. Troutman*, 572 F. Supp. 2d 955, 960 (N.D. Ill. 2008) (citation omitted). "Once the elements of the crime have been specified, an indictment need only provide enough factual information to enable the defendants to identify the conduct on which the government intends to base its case." *United States v. Fassnacht*, 332 F.3d 440, 446 (7th Cir. 2003). "[T]he indictment need only 'provide some means of pinning down the specific conduct at issue.'" *Id.* The indictment as a whole does this. Even viewing Count Two on its own, it is sufficient. Count Two alleges the elements of the offense and incorporates paragraph one of Count One, which sets forth that Ji's acts are related to the MSS, the JSSD, MSS Intelligence Officer A, and the MAVNI program. These facts provide some means for Ji to pin down the specific conduct at issue.

While not determinative, *Latchin* is instructive. In *Latchin*, the Seventh Circuit addressed on appeal a post-trial challenge to the sufficiency of the evidence with respect to a § 951 charge against the defendant, a "sleeper" agent for Iraq. The court rejected the challenge, stating:

> Latchin's argument that the proof was lacking in this department, on the other hand, is just plain wrong. *There may not have been direct evidence of acts on behalf of Iraq, but the circumstantial evidence was strong.* In addition to receiving sums of money from IIS personnel at international locations, Latchin placed 39 phone calls to IIS agent "Khalil"—second in command of the sleeper program—in Baghdad between June 2001 and May 2004. It's hard to believe that Latchin was just calling to chat, or that this was all done in connection with his IIS "pension plan." Whether Latchin actually spied on Iraqi Christians in the United States may be another matter altogether. But the jury did not have to find that he did to convict him under § 951. It was enough for the jury to conclude that Latchin took acts of *some kind* on behalf of Iraq without first registering as a foreign agent. The evidence was more than sufficient to meet that end.

*Id.* at 715 (emphasis added).

Ji argues that *Latchin* is wholly inapposite, but the Court is unpersuaded. If an individual can be convicted of a violation of § 951 when there "may not have been direct evidence of acts on behalf of" the foreign state, the Court cannot discern how a purported failure (which the Court assumes to be true solely for the sake of the instant point) to identify detailed acts in an indictment could result in its dismissal. As the Court has already ruled, the indictment as a whole sets forth the elements of the offense, fairly informs Ji of the nature of the charges against him, and enables him to plead an acquittal or conviction as a bar against future prosecutions for the same offense.

Ji also contends that the act he allegedly undertook at the direction or control of a foreign agent[3] -- obtaining background reports on United States citizens who were born in Taiwan or

---

[3] Despite arguing that he does not know what "act" he is alleged to have committed under Count Two, Ji then asserts that the purported act is not illegal.

5

China and worked at science and technology companies in the United States -- is a legal commercial transaction, which is expressly exempt from the conduct that is prohibited under § 951(a). As such, Ji asserts, Count Two fails to state an offense. The relevant language of the statute states:

> (d) For purposes of this section, the term "agent of a foreign government" means an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official, except that such term does not include—
>
> . . .
>
> (4) any person engaged in a legal commercial transaction.

Ji contends that this exception is an element of the offense that must be pleaded, while the government contends it is an affirmative defense. The Fourth Circuit recently concluded that the "legal commercial transaction" exception is an affirmative defense that need not be alleged in the indictment. *See United States v. Rafiekian*, 991 F.3d 529, 541 (4th Cir. 2021) ("In short, the 'legal commercial transaction' exception provides for an affirmative defense—which must be raised first, if at all, by a defendant—rather than an essential element of the offense."). The Court agrees with the *Rafiekian* decision.[4] Nevertheless, if, as Ji contends, the exception is an element of the offense, paragraph 1f of Count One, which is incorporated into Count Two, states, *"[a]bsent a lawful exception*, individuals who agreed to operate within the United States subject to the direction and control of a foreign government were required to provide prior notification to the Attorney General." (Indictment, Dkt. # 32, ¶ 1f) (emphasis added). Whether Ji's purchase of background reports falls within the exception will be determined at trial.

Nor is Defendant's challenge to venue persuasive. The indictment alleges that Defendant engaged in acts in Chicago in the Northern District of Illinois. Venue is improper "if the only acts that occurred in that district do not provide evidence of the elements of the charged crime." *United States v. Ochoa*, 229 F.3d 631, 636 (7th Cir. 2000). "[T]here is no single defined policy or mechanical test to determine constitutional venue." *United States v. Williams*, No. 18 CR 149, 2020 WL 4052145, at *2 (N.D. Ill. July 20, 2020) (internal quotation marks and citation omitted). The Court "takes into account a number of factors -- the site of the defendant's acts, the elements and nature of the crime, the locus and effect of the criminal conduct, and the suitability of each district for suitable fact-finding." *Id.* (internal quotation marks and citation omitted). "The flexibility of this approach reflects a concern that 'an overly mechanistic

---

[4] Ji engages in a lengthy discussion of the district court's ruling in *Rafiekian* regarding the defendant's motion to dismiss the indictment, in which the district court concluded that the "legal commercial transaction" exception is an element of the offense. *See United States v. Rafiekian*, No. 1:18-CR-457-AJT-1& 2, 2019 WL 3021769, at *9 (E.D. Va. July 9, 2019) ("Based on Section 951's text, structure, and legislative history, the Court concludes that the legal commercial transaction limitation on Section 951's coverage constitutes a substantive offense element rather than an affirmative defense."). The Court declines Ji's invitation to adopt the district court's reasoning, and instead, finds the Fourth Circuit's decision, which disagreed with the district court and reversed the district court's grant of the defendant's motion for acquittal, persuasive on this issue.

approach to the location of the defendant's acts may limit unrealistically the permissible venues in terms of the policy concerns that underlie the constitutional venue guarantee.'" *Id.* (citation omitted).

Here, the indictment alleges that Ji traveled to China from Chicago to meet with Chinese intelligence officials, communicated with Chinese intelligence officers by email and text, and purchased and emailed background reports to Chinese intelligence officials from this district. Not all the actions need have occurred in this district; venue is proper in any district where the crime began, continued, or was completed. 18 U.S.C. § 3237 ("[A]ny offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.")[5] By every indication, Defendant lived in Chicago during the relevant time period; discovery and pretrial motions filed by Ji indicate that he was approached by an undercover agent "outside of his apartment in Chicago" in April 2018 and met with law enforcement agents after returning to Chicago from a trip to Denver on September 25, 2018. Moreover, during the entire pendency of the instant case, there has been no indication that this district is unsuitable for factfinding. The Court concludes that the government has established that venue is proper in this district by a preponderance of the evidence.

Finally, Ji argues that dismissal of the indictment is necessary based on purported defects in the grand jury presentation. "For an indictment to be dismissed on account of false testimony presented to the grand jury, the defendant must show prejudice amounting to either proof that the grand jury's decision to indict was substantially influenced, or that there is grave doubt that the decision to indict was substantially influenced, by testimony which was inappropriately before it." *United States v. Zambrano*, No. 20 CR 00049, 2021 WL 4318079, at *1 (N.D. Ill. Sept. 22, 2021) (citation internal quotation marks omitted). Ji asserts that the grand jury was never informed that the elements of the offense require proof of an "act" as an unregistered foreign agent; engaging in legal commercial transactions is exempt from criminal liability; violations of corporate terms of service (*i.e.*, that the relevant background-reporting companies' terms of service do not allow purchases from outside the U.S.) do not make a transaction illegal; and Ji did not join the MAVNI program at the direction or control of a foreign government, but of his own volition.

As to the background-reporting companies' terms of service, the government notes that Ji was located in the U.S., so the fact that the grand jury heard testimony that the companies did not allow purchases from outside the U.S. was not intended to establish Ji's criminal liability. Rather, the testimony was used to demonstrate motive and knowledge. Specifically, the government presented the testimony to explain why the Chinese intelligence officers directed Ji to purchase the background reports in the U.S. instead of purchasing them from China. The

---

[5] Defendant asserts that the government, in relying on § 3237, is confusing the conspiracy count with the substantive offense under § 951. The Court disagrees. While Ji may have engaged in offending acts in different districts, as long as the acts, any conduct that provides evidence of the offense, or the effect of the offense occurred in this district, venue is proper here. As noted, the government alleges that communications, travel, and the purchasing of reports occurred in this district; therefore, Ji's challenge to venue is rejected.

government further notes that the testimony corroborated Ji's statements to an undercover agent that he understood that he was directed to purchase the reports in the U.S. because of the companies' restrictions. (Grand Jury Tr., Dkt. # 159, Ex. A., at 6, 8.)[6]

Nor is the Court persuaded by Ji's assertion that the grand jury was led astray when it was not informed that the elements of the offense require proof of an "act" as an unregistered foreign agent. Ji argues that the following statement, which the government presented to the grand jury, was improper: "absent a lawful exception, individuals who agree to operate within the United States at the direction and control of a foreign government are required to provide notification to the Attorney General." (*Id.* at 13-14.) As the government notes, once an individual agrees to operate, he must provide notice to the Attorney General before he acts; thus, the statement presented to the grand jury is accurate. Moreover, the indictment presented to the grand jury includes the element in the § 951 charge that Ji acted as a foreign agent. Thus, this objection fails.

As to the fact that Ji participated in the MAVNI program of his own accord and not at the direction of Chinese intelligence officials, Ji acknowledges that the special agent who presented testimony to the grand jury stated that Ji voluntarily joined the program. (Def.'s Mem. Law Supp. Mot. Dismiss Count Two, Dkt. # 141, at 21.) Ji argues, however, that the grand jury was never informed that "agent of a foreign government," as used in § 951 and as set forth in Count Two, means an individual "who agrees to operate within the United States subject to the direction or control of a foreign government or official." Ji conclusorily states that, as a result, the grand jury "was deprived of the ability to assess the relevance of this critically important factor." (*Id.* at 22.) Ji's objection is vague and unspecific. Moreover, Ji fails to establish that the grand jury's decision to indict was substantially influenced by the purported omission, or that there is grave doubt that the decision to indict was substantially influenced by the purported omission. As the government notes, the grand jury heard testimony over two days from the case agent and other witnesses regarding Ji's conduct and reviewed the indictment. Importantly, the government also asserts that the grand jury "received information that the statute requires an agreement to operate at the direction of a foreign government and criminal liability attaches when an individual acts in the United States pursuant to this agreement," (Gov't's Resp., Dkt. # 179, at 14), which is reflected in the grand jury transcript. (Grand Jury Tr., Dkt. # 159, at 13-14.)

---

[6] In his reply, Ji makes a convoluted argument about the government's changing its reasons for offering the testimony regarding the terms of service of the background-reporting companies. Ji argues that the grand jury presentation was therefore "incomplete and misleading." (Def.'s Reply, Dkt. # 195, at 15.) The Court disagrees and finds that the government's presentation to the grand jury was not misleading. Even assuming arguendo that the government created an after-the-fact rationale for having offered the testimony regarding the terms of service of the background-reporting companies, the testimony still corroborated Ji's statement to the undercover agent that he was being directed to purchase the reports because of the companies' restrictions on purchases outside of the U.S.

8

For these reasons, the motion to dismiss Count Two of the indictment is denied.

**Date:**  September 30, 2021

Ronald A. Guzmán
**United States District Judge**

9

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| Plaintiff, | ) | No. 18 CR 611 |
| | ) | |
| v. | ) | Judge Ronald A. Guzmán |
| | ) | |
| Ji Chaoqun, | ) | |
| Defendant. | ) | |

## ORDER

The Court assumes knowledge of the facts of and prior rulings in this case. Count Two of the superseding indictment charges Defendant with violating 18 U.S.C. § 951, which makes it a crime to act in the United States as an agent of a foreign government without prior notification to the Attorney General. The statute defines the term "agent of a foreign government" as "an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official, except that such term does not include … any person engaged in a legal commercial transaction." 18 U.S.C. § 951(d)(4). Defendant contends that the act he is alleged to have engaged in, the purchase of background reports on potential recruits for the MSS, constitutes a legal commercial transaction, which would put him outside the relevant statutory definition of foreign agent. The government seeks to bar Defendant from making this argument, asserting that the statute does not exempt from the definition of an "unregistered foreign agent" an individual engaged in "spying activities" on behalf of a foreign government, even if those activities involve otherwise legal commercial transactions. Defendant contests the government's interpretation of the defense and asserts that he is entitled to present the defense to the jury for a determination as to whether the defense applies.

Defendant is correct that the Court's first tool in interpreting a statute is to read its plain language. (Def.'s Resp., Dkt. # 334, at 3) (citing *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1749 (2020) ("This Court has explained many times over many years that, when the meaning of the statute's terms is plain, our job is at an end.")). But, as the Supreme Court has noted, "[w]hether a statutory term is unambiguous 'is determined [not only] by reference to the language itself, [but also by] the specific context in which that language is used, and the broader context of the statute as a whole.'" *Yates v. United States*, 574 U.S. 528, 528-29 (2015) (alterations in *Yates*).

*Yates* is instructive in interpreting the legal-commercial-transaction exception in § 951. In *Yates*, "a commercial fisherman . . . caught undersized red grouper in federal waters in the Gulf of Mexico" and "[t]o prevent federal authorities from confirming that he had harvested undersized fish, Yates ordered a crew member to toss the suspect catch into the sea." *Id.* at 531. The government charged Yates with a violation of 18 U.S.C. § 1519, which is part of the Sarbanes-Oxley Act of 2002 and provides:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up,
> falsifies, or makes a false entry in any record, document, or tangible
> object with the intent to impede, obstruct, or influence the
> investigation or proper administration of any matter . . . shall be fined
> under this title, imprisoned not more than 20 years, or both.

*Id.* at 531.   Specifically, the government charged Yates with destroying, concealing, and covering up undersized fish to impede a federal investigation. *Id.* at 534. At the end of the government's case at trial, Yates moved for a judgment of acquittal, arguing that § 1519 "sets forth 'a documents offense' and that its reference to 'tangible object[s]' subsumes 'computer hard drives, logbooks, [and] things of that nature,' not fish." *Id.*  The government asserted that a 'tangible object' within § 1519's compass is 'simply something other than a document or record.'" *Id.*

In addressing the interpretation of the term "tangible object" in § 1519, the Supreme Court acknowledged that the dictionary definition of the term "tangible object" could favor a broad meaning but concluded that "the context of § 1519 tugs strongly in favor of a narrower reading." *Id.* at 539 (plurality opinion). The Supreme Court looked at the caption of the statute, the surrounding terms in the relevant list, and the section's position within the chapter to find that

> it would cut § 1519 loose from its financial-fraud mooring to hold that
> it encompasses any and all objects, whatever their size or significance,
> destroyed with obstructive intent. Mindful that in Sarbanes–Oxley,
> Congress trained its attention on corporate and accounting deception
> and coverups, we conclude that a matching construction of § 1519 is
> in order: A tangible object captured by § 1519, we hold, must be one
> used to record or preserve information.

*Id.* at 532 (plurality opinion).

Here, the original version of § 951 was enacted in 1917, in part, in response to German intelligence operators legally purchasing U.S. media organizations during World War I and using them to attempt to influence American opinion of Germany during the war. While the purchases of media outlets were legal transactions, Congress perceived this conduct, among other clandestine activities, as a national-security threat. As one commentator explains, then-Attorney General Thomas Watt Gregory included in his 1916 Annual Report to Congress a proposal called "Changes in Laws Affecting Neutrality and Foreign Relations." David Aaron, <u>18 U.S.C. Section 951 and the Non-Traditional Intelligence Actor Threat from the First World War to the Present Day</u>, 45 Seton Hall Legis. J. 1, 15-16 (2021) (hereinafter, "the Aaron Article"). Watts noted that "'[m]any acts committed in the U.S. in serious violation of its sovereignty and against the peace and safety of its citizens are not now punishable by any Federal criminal law; others are punishable only under unsatisfactory statutes passed in relation to conditions altogether different from those now prevailing.'" *Id.* at 16 (citation omitted). One part of Watts's 1916 proposal eventually became § 951. *Id.*

A 1984 amendment added the legal-commercial-transaction exception. *See* Comprehensive Crime Control Act of 1984, Pub. L. No. 98-473, Title II, § 1209, 98 Stat. 1976, 2164. The amendment was debated at a 1982 Congressional hearing entitled "Communist Bloc Intelligence Gathering Activities on Capitol Hill," during which a State Department witness testified that "agent of a foreign power" should except "American lawyers who represent foreign governments in American courts and individuals involved in routine commercial activities. . . ." *Communist Bloc Intelligence Gathering Activities on Capitol Hill: Hearing on S. 1959 and S. 1963 Before the Subcomm. On Sec. and Terrorism of the Comm. on the Judiciary*, 97th Cong., Ser. No. J-97-116, at 38 (1982). In addition, a Senate Report on the exceptions to § 951 states that

> [t]he proposed Act is not intended to cover those individuals in routine commercial matters but is intended to cover individuals who represent foreign governments in political activities that may or may not come within the scope of the Foreign Agent[s] Registration Act. By excluding from the notification requirement several classes of individuals who are presently covered, the proposal also limits the coverage of the statute by focusing only on those in whom the United States Government has a necessary interest.

S. Rep. No. 98-225 at 415.[1]

Based on Congress' intent in enacting both the statute and the subsequent legal-commercial-transaction exception, the Court can discern no basis on which to conclude that the phrase "any individual engaging in a legal commercial transaction" exempts from the reach of the offense individuals who have anything other than a strict commercial relationship with the foreign nation. As in *Yates*, to interpret the exception solely based on its plain language divorced from its context and legislative history would wholly gut the purpose of statute and allow an individual who is alleged to have engaged in (and is subsequently convicted of engaging in) acts against the interests of the United States to escape conviction simply by cloaking any one of the alleged acts in the protective cover of a "legal commercial transaction." Such an interpretation is counter to the purposes of the statute and leads to an absurd result. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer*, 49 F.3d 323, 326-27 (7th Cir. 1995) ("We look beyond the express language of a statute . . . where a literal interpretation would lead to absurd results or thwart the goals of the statutory scheme.").

---

[1] The information gathering Defendant is alleged to have engaged in is one of the main activities targeted by the statute and in which the U.S. government has a "necessary interest." According to the Aaron Article, "[a] review of indictments and plea agreements in other cases in which the DOJ charged violations of Section 951 in roughly the first ten years of this century reveals that most fall into one of two categories: information-gathering and procurement or sanctions evasion." Aaron, supra, at 28-29; *see also United States v. Alshahhi*, 21-CR-371 (BMC), 2022 WL 2239624, at *11 (E.D.N.Y. June 22, 2022) (citing the Aaron Article and stating that "[i]nformation-gathering and perception management are exactly the activities in which defendants are alleged to have engaged here. Therefore, defendants cannot fairly argue that their conduct is not the sort plainly targeted by Section 951, or that they lacked notice."). Defendant's contention that the activities he is alleged to have engaged in are not "political" and therefore not the focus of § 951 is unpersuasive.

Even assuming arguendo that Defendant's interpretation of the term "legal commercial transaction" is accurate, Defendant's alleged criminal conduct is not restricted to the purchase of background information. The superseding indictment alleges that Defendant engaged in certain acts in furtherance of his purported agreement to act as an undisclosed agent of the PRC, namely that Defendant travelled between Chicago and Beijing, China on multiple occasions; met Intelligence Officer A on December 18, 2013 and January 10, 2014; exchanged text messages with Intelligence Officer A; purchased background reports for certain individuals from Companies A, B, and C on August 30, 2015 and made background-check information available to Intelligence Officer A by email on August 30, 2015; and purchased background reports from Company A on September 18, 2015 and made background-check information available to Intelligence Officer A by email on September 18, 2015.[2] Given these allegations, Defendant's purported relationship with the PRC extended beyond that of engaging in a legal commercial transaction and would be sufficient to convict him if the jury concludes that the government has met its burden with respect to proving that Defendant engaged in these acts. *See United States v. Latchin*, 554 F.3d 709, 715 (7th Cir. 2009) ("In addition to receiving sums of money from IIS personnel at international locations, [the defendant] placed 39 phone calls to IIS agent "Khalil" . . . in Baghdad between June 2001 and May 2004. . . . Whether Latchin actually spied on Iraqi Christians in the United States may be another matter altogether. But the jury did not have to find that he did to convict him under § 951. It was enough for the jury to conclude that Latchin took acts of *some kind* on behalf of Iraq without first registering as a foreign agent.") (emphasis in original).[3]

---

[2]　In its reply in support of its motion to exclude the defense, the government also asserts that Defendant sent messages "to his acquaintance Yu Wenzhi, [in which he] explained how he surreptitiously took pictures of his MSS agreement, received cash from the MSS for 'operational' funds, and asked Yu to help him recruit scientists as part of his work for the MSS." (Gov't's Reply, Dkt. # 329, at 10.) The government futher points to Defendant's application to the FBI honors internship program as evidence against Defendant that does not implicate Defendant's interpretation of the legal-commercial-transaction exception. *Id.*

[3]　Defendant contends that he is entitled to offer a partial affirmative defense, at least as to the allegation that he purchased background reports at the direction of the PRC. Defendant analogizes § 951 to RICO cases, in which "the Seventh Circuit has recognized that partial affirmative defenses can be put forth to 'knock out' specific predicate acts, even when other predicates remain viable." (Def.'s Supp. Resp., Dkt. # 366, at 2.) The Court finds the analogy inapt. First, for the reasons already stated, the Court disagrees that analyzing a § 951 charge on an act-by-act basis is appropriate. Even assuming arguendo that such an approach is proper, in a RICO case, the government must show in part a pattern of racketeering activity, which requires two predicate acts in a ten-year period. *United States v. Farmer*, 38 F.4th 591, 602 (7th Cir. 2022). Thus, rebutting predicate acts individually can subvert the government's case. Here, however, § 951 does not require the government to show a particular number of acts, and Defendant does not point to any evidence undermining the other acts supporting the § 951 charge in this case. Accordingly, eliminating only the purchase of background reports as an act does not assist Defendant in defeating the § 951 charge. *See United States v. Grapp*, 653 F.2d 189, 194-95 (5th Cir. 1981) ("The rule governing the refusal to charge the jury on a theory of defense is well-settled. Reversible error occurs when there is an evidentiary foundation for the defense and the defense would be legally sufficient to warrant an

4

As the record currently stands, Defendant points to no legal or factual basis for asserting that he is wholly excepted from the definition of "agent of a foreign government." Accordingly, the government's motion to exclude the legal-commercial-transaction affirmative defense [329] is granted.

**Date**: September 22, 2022

*Ronald A. Guzmán*

**Ronald A. Guzmán**
**United States District Judge**

---

acquittal if believed by the jury. Examining the requisites in reverse order we find that no such defense was presented in this case. Assuming the jury believed that Thatcher did not meet Malo in Chicago on or about May 27, 1977, Thatcher would still be vulnerable to the RICO charges. The alibi defense related to only one of the many predicate offenses underlying the RICO charge. A RICO conviction requires proof of two predicate crimes. A failure of proof on any additional predicate offenses would eliminate only a surplus finding, it would not change the resultant conviction.") (internal citation omitted).

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| United States of America,<br>Plaintiff, | )<br>)<br>) | No. 18 CR 611 |
| v. | )<br>)<br>) | Judge Ronald A. Guzmán |
| Ji Chaoqun,<br>Defendant. | )<br>) | |

## MEMORANDUM OPINION AND ORDER

For the reasons stated below, Defendant's motion to suppress statements he made to an undercover agent [144] is denied.

## STATEMENT

Ji seeks to suppress statements he made during three meetings with an undercover law enforcement agent ("UC"), who was posing as a member of the Chinese intelligence community. The general background facts are as follows. According to the government, its initial investigation of another Chinese intelligence officer, Xu Yanjun,[1] and its knowledge that Ji had lied on background-investigation forms when applying for the U.S. Army MAVNI program, "presented an opportunity to meet with Ji about the details of his efforts to covertly act within the United States as an agent of the Chinese intelligence apparatus," and led the UC to meet with Ji "on three occasions as part of [the government's] ruse." (Gov't's Resp., Dkt. # 177, at 5.) Ji's three encounters with the UC occurred on April 25, 2018; May 17, 2018; and September 25, 2018. Draft transcripts have been provided by the government, and the Court has viewed videotaped recordings of the conversations.

While the parties characterize the facts differently, the following sequence of events appears undisputed. On the afternoon of April 25, 2018, the UC approached Ji outside his apartment in Chicago. The UC, who had never before met Ji, asked Ji if it was convenient to talk. When Ji responded, "I beg your pardon?", the UC stated, "I need to talk to you," and indicated that he had been sent by Ji's "Nanjing friend," to which Ji responded, "Oh, [I] understand now."[2] Ji and the UC then entered the UC's car, at which time the UC said, "I am not sure whether you are aware that the Nanjing friend was caught." Ji responded, "I don't know," and when the UC asked, "[D]o you know whom I'm referring to?", Ji stated, "I am not sure because I know quite a few people in Nanjing." Using his phone, the UC then showed Ji an article about Xu's arrest. Ji stated he was not aware of the arrest but knew who Xu was. The UC

---

[1] Xu was charged and convicted in the Southern District of Ohio with conspiracy to commit economic espionage and trade-secret theft. *United States v. Xu*, No. 18 CR 43 (S.D. Ohio).

[2] The government states that "Nanjing friend" is code for Chinese intelligence. (Gov't's Resp., Dkt. # 177, at 5.)

told Ji that "this is a serious matter. I came here yesterday. I would like to talk to you about it. They asked me to do it." Ji indicated that he had to attend Army training and asked if they could meet later. The UC urged Ji to meet with him, and they drove to a nearby hotel, where they went to one of the guest rooms. They arrived at the hotel at approximately 3:54 p.m. and left at approximately 4:50 p.m.

A hidden video camera captured Ji and the UC's conversation in the hotel room.[3] The UC offers Ji water and tells Ji to take a seat. The UC sits at the desk while Ji sits in the chair next to the desk. The video does not show anyone else in the room. Both parties appear relaxed, though Ji seems curious as to why he is there. The UC asks Ji if he has met Xu before, and Ji responds, "Yes." The UC again shows Ji the news article about Xu's arrest and indicates that he was sent by Zha Yong, "who works with Mr. Xu," to speak with Ji to find out why Xu was arrested and "why the U.S. became aware of him." The UC states:

> We are not sure whether the problem lies with your communication with them. Why the U.S. targeted Mr. Xu. That's why I asked you to let you know that you could stop contacting them for now . . . because we do not know which communication caused it [*i.e.*, the arrest], whether it was the telephone calls or email messages or what. He told us that you contacted them before. That's why I want to find out what caused the problem. Do you think the problem lies with your contacting them?

The UC reiterated on several occasions that "they" were trying to find out "what caused the problem." Ji indicated that he communicated with Zha through WeChat and text and with a "third person" via email. Some of these communications were to exchange holiday greetings only, according to Ji. The UC then asked about Ji's association with the U.S. Army, and Ji described the MAVNI program, indicating that it was the fastest way to attain U.S. citizenship. Ji also stated that he had passed the FBI background check and had been granted top-secret clearance but could not use the clearance until he was granted U.S. citizenship. Ji stated that he has been in communication via WeChat with other Chinese-born citizens in the U.S. Army but had not met them personally. Ji volunteered to the UC that he could enter all military bases with his military ID and could take pictures "freely there." Ji and the UC discussed that Ji would like to go back to China to see his family. The UC gave Ji a cell phone and told Ji to wait for contact from the UC.

The second meeting occurred on May 17, 2018 and lasted approximately 75 minutes. The UC picked Ji up from his apartment and drove him to the hotel, where they again met in a hotel room. The UC asked, "Do you want . . . ?" and Ji stated, "I am okay." Ji presented documents to the UC, who said, "You printed a lot!" and Ji responded, "I did. I have brought pretty much everything here." Ji indicated that the documents show that the U.S. Army applied for his top-secret clearance and found "no issue." Ji also presented documents on the MAVNI program and his enlistment contract and indicated that the U.S. Army only contacted his

---

[3] The Court has viewed the video and audio recordings of each of the three meetings in the hotel room. The men spoke in Mandarin, so the Court has also referred to the draft translations provided by the government.

reference in the United States, not the ones who lived in China. Ji provided additional details about the background information he gave to the U.S. Army, including his trips to China as well as the identity of individuals he contacted while in China, and how those communications were made (i.e., via email or text). In his motion to suppress, Ji notes that the UC told Ji that "Mr. Xu kept a log of their communications [i.e., between Ji and Xu] and that the Jiangsu Province MSS Division Director tasked [the UC] to verify all of the communications Mr. Ji had with Mr. Xu." (Def.'s Mot. Suppress, Dkt. # 144, at 6.) Ji further notes in his motion that the UC asked numerous questions about the steps Ji took to maintain the privacy of the communications with Xu and describes the UC's inquiries in that regard as "accusatory."

The third meeting occurred on September 25, 2018. Ji had just returned to Chicago on a 6:00 a.m. flight from Denver. The UC picked Ji up at his apartment at approximately 9:53 a.m. and they drove to the same hotel where they previously had met. During the car ride, the UC stated that "they have found, they said, they want to ask you if you have used, any device you used when you communicate with them, like USB, computer or cell phone" and said "they" wanted Ji to give the UC any of those devices. At the hotel, the UC asked about the progress of the background investigation and questioned Ji about his communications with Xu and others. Ji also discussed having purchased background reports on certain individuals and having obtained the reports using a false name, and a false address and phone number. Ji further stated during the meeting that he encrypted the background reports and sent them to intelligence officers by email and a chat application, with the false label of "Mid Term Test Questions."

In all three of these meetings, the video recording shows that both the UC and Ji appear composed and unworried. While Ji seemed curious and slightly more formal during the initial meeting, at no time did he seem pressured or uncomfortable. Both Ji and the UC laughed at several points in the meetings. The UC often sat back in his chair as Ji was speaking. Particularly during the second and third meetings, Ji seemed engaged and eager to provide information. The UC never spoke in an aggressive or threatening way, did not accuse Ji of lying, and did not display any weapons. While the UC reiterated the seriousness of determining the source of the leak and ensuring the security of the communications that Ji had with Chinese intelligence agents, the UC did not threaten Ji or his family with any type of harm, legal action, or criminal liability.

## Analysis

"The Fifth Amendment . . . guarantees that only voluntary statements may be used against defendants, which means that involuntary statements obtained even in a noncustodial setting must be excluded." *United States v. Zambrano*, No. 20 CR 0049, 2021 WL 3709194, at *6 (N.D. Ill. Aug. 21, 2021). To obtain an evidentiary hearing on a motion to suppress, a defendant is required to "'provide sufficient information to enable the court to conclude that a substantial claim [wa]s presented and that there [we]re disputed issues of material fact which w[ould] affect the outcome of the motion.'" *United States v. Greve*, 490 F.3d 566, 572 (7th Cir. 2007) (citation omitted and alterations in *Greve*). Specifically, Ji has "the burden of presenting 'definite, specific, detailed, and nonconjectural facts' to establish that there was a disputed issue of material fact as to the voluntariness" of his statements. *United States v. Toro*, 359 F.3d 879, 885 (7th Cir. 2004).

Ji begins his motion to suppress by stating that "high ranking U.S. officials have publicly denounced [the People's Republic of China] as a grossly authoritarian, oppressive, and abusive government on many occasions." (Def.'s Mot. Suppress, Dkt. # 144, at 1.) Ji goes on to assert that law enforcement sent the UC to pose as a "high-level operative of one of the world's most powerful intelligence agencies—the People's Republic of China's Ministry of State Security" to elicit information from Ji about whether his contacts with Xu could have been the cause of Xu's arrest. According to Ji, the UC "utilized the imprimatur of the Chinese government and tacitly if not explicitly relied on Chinese legal doctrines requiring Mr. Ji to speak to members of the Chinese government." (*Id.*, at 2.) Specifically, Ji points to the 2015 State Security Law of the People's Republic of China, which, in relevant part, provides for criminal punishment should an individual violate the law, including by not "providing necessary support and assistance to national security organs, public security organs, and military organs." (*Id.* at 15) (citation omitted). Ji also references the Criminal Procedure Code of the People's Republic of China, which "provides specific obligations for citizens either suspected of a crime or of being a witness to answer relevant questions truthfully when requested." (*Id.*) (citation omitted). Finally, Ji notes that the National People's Congress recently passed the National Intelligence Law of the People's Republic of China which, Ji states, "demands that citizens shall support, assist, and cooperate with the state intelligence network in accordance with the law, and keep secrets of the national intelligence work known to the public." (*Id.*)[4]

From this, Ji contends that:

> as a Chinese citizen, when approached by a purported MSS-affiliate, [he] was compelled to provide any and all information, assistance, and support requested or suffer consequences without parallel in the United States. Thus, given the ruse employed by the FBI, [Ji's] statements were necessarily "compelled" by extrinsic considerations attendant to the interrogation, involuntary within the meaning of the relevant United States' constitutional provisions, and thus, must necessarily be suppressed.

(*Id.* at 17.)

As an initial matter, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Ji points to no police coercion. The recordings reflect that the UC did not mention the above-referenced Chinese laws and did not threaten or coerce Ji. The Seventh Circuit's decision in *United States v. Lawal*, 231 F.3d

---

[4] Ji's reply in support of his motion to suppress statements made to the UC goes into significant detail regarding the laws cited, the Chinese authorities' enforcement of these laws, and how various U.S. governmental agencies have interpreted the effect of these laws on Chinese citizens and companies. While the parties dispute whether the cited Chinese laws actually require the extent of the cooperation and assistance that Ji argues they do, the Court assumes for purposes of this motion that Ji's characterization of the stated Chinese laws is accurate; they still do not require an evidentiary hearing.

1045 (7th Cir. 2000), is instructive.  In *Lawal*, the defendant argued that statements he made to the police were involuntary and unknowing in part because "he comes from a country where he would have been beaten or tortured if he did not comply with police demands." *Id.* at 1048.  The Seventh Circuit upheld the district court's denial of the defendant's motion to suppress, stating:

> [T]here is no factual basis for a finding that Lawal involuntarily incriminated himself.  Lawal fails to allege any misconduct, abuse, or physical or mental coercion by the police who questioned him; instead, Lawal builds his entire argument on his unique personal characteristics. Without showing some official coercion, Lawal's argument fails.

*Id.*

Nor has Ji referred to any subjective belief that he was required to respond to the UC, only asserting that he was "terrified upon initially being approached by the undercover agent and learning who he claimed to represent," and that he initially attempted to evade meeting with the UC.  The Court concludes that Ji has failed to point to "'definite, specific, detailed, and nonconjectural facts' to establish that there was a disputed issue of material fact as to the voluntariness" of his statements.

Looking at a totality of the circumstances, including Ji's age (26); his advanced education (Masters' Degree in electrical engineering); the lack of any physical coercion or psychological intimidation; the conversational tone of the meetings[5]; Ji's voluntary printing and provision of numerous documents related to his background check and MAVNI application; the time the meetings occurred (midday), and the fact that Ji voluntarily accompanied the UC to the hotel on each occasion, the Court finds Ji's statements to the UC were knowingly and voluntarily made. *See Lawal*, 231 F.3d at 1048 ("A confession is voluntary if the totality of the circumstances demonstrates that it was the product of rational intellect and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics calculated to overcome the defendant's free will.").

For these reasons, the motion for an evidentiary hearing and motion to suppress are denied.

**Date**: November 16, 2021

_Ronald A. Guzmán_
**Ronald A. Guzmán**
**United States District Judge**

---

[5] As indicated, on several occasions during their meetings, Ji and the UC were laughing and appeared comfortable and at ease with one another, and Ji appeared eager to share what information he had.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| United States of America,      ) | |
| Plaintiff,      ) | |
| ) | No. 18 CR 611 |
| v.      ) | |
| ) | Judge Ronald A. Guzmán |
| Ji Chaoqun,      ) | |
| Defendant.      ) | |

## MEMORANDUM OPINION AND ORDER

For the reasons stated below, the government's motion to exclude the testimony of Defendant's experts [289] is granted.

## STATEMENT

Defendant served his expert disclosures on May 16, 2022, identifying two experts, Nicholas J. Lewin and Professor Donald Clarke. The government seeks to exclude the testimony of both Lewin and Clarke.

**Nicholas Lewin**

The government seeks to exclude the testimony of Nicholas Lewin, a partner at the law firm of Krieger Kim and Lewin LLP who specializes in national security law, including violations of the Foreign Corrupt Practices Act and the Foreign Agents Registration Act. Lewin served as the Special Counsel for former FBI Directors Robert S. Mueller III and James B. Comey. In that capacity, Lewin acted as each Director's national security advisor on policy, strategic, legal, and operational issues. Lewin also served for more than a decade as an Assistant United States Attorney in the Southern District of New York, during which time he investigated and prosecuted national security cases. As Deputy Chief of the Criminal Division, Lewin supervised a variety of cases, including the Office's national security cases.

Defendant's disclosure states that Lewin is expected to testify that:

- Purchases of the commercial background reports that are at issue in this case would reasonably qualify as legal commercial transactions under 18 U.S.C. § 951(d)(4), as further defined by 28 C.F.R. § 73.1.
- A potential claim of a violation of the terms of service associated with the commercial websites at issue would not alter his opinion regarding the legality of the commercial transactions at issue in this case for purposes of 18 U.S.C. § 951(d)(4).

- The circumstances surrounding the transfer of the background reports, such as the alleged disguising of the true nature of the background reports for purposes of transferring the reports by electronic mail, would not alter his opinion regarding the legality of the commercial transactions at issue in this case for purposes of 18 U.S.C. § 951(d)(4).

(Gov't's Mot. Exclude, Ex. A, Dkt. # 289-1, at 3-4.)

The government seeks to exclude Lewin's testimony on the ground that it invades the province of the jury because he will be opining on the proper interpretation of a federal law and accompanying regulations. *Scottsdale Ins. Co. v. City of Waukegan*, 689 F. Supp. 2d 1018, 1022 (N.D. Ill. 2010) ("Although experts may provide opinions as to the ultimate factual issues in a case, [*United States*] *v. Pansier*, 576 F.3d 726, 738 (7th Cir. 2009), they may not testify 'as to legal conclusions that will determine the outcome of the case' under Rule 702.") (quoting *Good Shepherd Manor Found. v. City of Momence,* 323 F.3d 557, 564 (7th Cir. 2003) (excluding expert testimony that consisted of legal conclusions), and citing *In re Ocean Bank,* 481 F. Supp. 2d 892, 898 (N.D. Ill. 2007) ("Expert testimony as to legal conclusions that will determine the outcome of a case is inadmissible.")).

Defendant contends as follows:

> Mr. Lewin's opinions are not purely legal in nature, and to the extent they are at all "interpretive," it is only insofar as they are applying complex legal provisions to the specific facts of the case, and in particular, to the commercial background report-related evidence. Put differently, Mr. Lewin is not going to be asked to simply interpret the legal commercial transaction exception for the jury. Instead, he is going to be asked whether certain forms of alleged conduct—violating purely corporate terms of service, for example—fall within or outside that exception.
>
> . . . [H]e is going to be asked to assume the truth of the government's evidence regarding the purchase and transfer of background reports. . . . [and] is then going to be asked whether he is aware of a federal or state law that it conceivably violates, which he is expected to answer in the negative.
>
> . . .
>
> . . . Mr. Lewin's testimony in this case will be focused on using his years and years of experience to apply the assumed facts of the case primarily to his knowledge of each and every criminal provision of the United States Code, as well as criminal laws of the United States, to straightforwardly note that those allegations do not implicate any separate offense.

(Def.'s Sur-Reply, Dkt. # 294, at 2, 4.) The resulting implication is that if the purchase of background reports is not illegal, as opined by Lewin, then it must be legal, and therefore Defendant's conduct satisfies the legal commercial transaction exception under § 951(a). (*Id.* at

6.)[1] According to Defendant, because such testimony is "helpful" under Federal Rule of Evidence 702, it is admissible. (*Id.*)

In support of his position that legal expert conclusions are admissible, Defendant relies heavily on the court's ruling in *Richman v. Sheahan*, 415 F. Supp. 2d 929 (N.D. Ill. 2006), a § 1983 case alleging excessive force and failure to train. The plaintiff challenged the admissibility of the defendants' expert opinions regarding the reasonableness of the force that the officer used. The *Richman* court discussed Rule 704(a), which provides that the "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a). "Rule 704 does not define 'ultimate issue,' but it is generally thought that ultimate issues under the Rule must be factual and not legal." *Id.* at 944-45. The *Richman* court stated that the "admissibility of opinion testimony that may involve legal conclusions ultimately rests . . . not on labels, but 'upon whether the testimony helps the jury resolve the fact issues in the case.'" *Id.* at 945. Accordingly, "[t]he inquiry should focus on whether the opinion is phrased in terms that employ legal criteria that the jury does not understand based upon its own experiences in life." *Id.* The *Richman* court noted with approval a statement from the Fourth Circuit that "'[t]o determine when a question posed to an expert witness calls for an improper legal conclusion, the district court should consider first whether the question tracks the language of the legal principle at issue or of the applicable statute, and second, whether any terms employed have specialized legal meaning.'" *Id.* at 947 (citation omitted). Defendant contends that Lewin will not be employing any specialized terminology or invoking a standard of care or mental state, and "beyond the plain definition of a legal commercial transaction as one that does not violate any independent state or federal law, he will not even be touching upon a statutorily defined term." (Def.'s Sur-Reply, Dkt. # 294, at 6.) The Court is not persuaded.

"There is a fine line between legal opinions that impermissibly intrude on the jury's role and those that assist the jury in reaching its decision." *Chi. Teachers Union, Local 1 v. Bd. of Educ. of Chi.*, 12 C 10311, 2020 WL 914881, at *12 (N.D. Ill. Feb. 25, 2020). Here, Lewin's testimony crosses that line because he will opine as to the meaning of a specific legal term with an implementing regulation that defines the legal term. *See* 28 C.F.R. § 73.1(f) ("The term legal commercial transaction, for the purpose of 18 U.S.C. 951(d)(4), means any exchange, transfer, purchase or sale, of any commodity, service or property of any kind, including information or intellectual property, not prohibited by federal or state legislation or implementing regulations."); *see also Chi. Teachers Union, Local 1*, 2020 WL 914881, at *12 ("The Court agrees that Blanchflower cannot opine on whether Plaintiffs suffered an adverse employment action. Adverse action has a specific legal definition and expert testimony as to whether class members suffered an adverse action would qualify as an impermissible legal conclusion."). The "'meaning of statutes, regulations, and contract terms is a subject for the court, not for testimonial experts. The

---

[1] It is worth noting here that, according to the government, Defendant is not entitled to assert a legal-commercial-transaction affirmative defense at trial because "[t]he exception allows certain kinds of agency relationships, such as a lawyer acting on behalf of a foreign agent, and not actions the defendant surreptitiously takes as a spy for a foreign government." (Gov't's Reply, Dkt. # 293, at 3 n.1) (citing Gov't's Resp. Mot. Dismiss Indictment, Dkt. # 179, at 2). If the Court precludes Defendant from raising the defense, an issue that is not currently before the Court, then a determination as to the admissibility of Lewin's testimony will be unnecessary.

only legal expert in a federal courtroom is the judge.'" *United States v. Bloom*, 846 F.3d 243, 255 (7th Cir. 2017) (citations and certain internal quotation marks omitted). Contrary to Defendant's contention, Lewin's opinion that the "purchase and transfer of the background reports appear to constitute 'legal commercial transactions,'" (Def.'s Sur-Reply, Dkt. # 294, at 6), clearly embodies a legal conclusion and improperly impedes on the province of the Court.

Moreover, "allowing a witness to testify as to a legal conclusion may cause the jury to accord too much weight to that testimony, and may [imply] that the jury should look to that witness for legal guidance." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 610 (7th Cir. 2006). This is particularly true where, as here, Defendant is using a lawyer's expert testimony to address Defendant's self-admitted "difficult situation of ruling out any potential illegality," pursuant to his interpretation of the affirmative defense. (Def.'s Resp., Dkt. # 291, at 24.) As the government notes, Defendant cannot rely on Lewin's testimony to "salvage" an insufficient presentation by essentially telling the jury that Defendant has met the requirements of the legal-commercial-transaction defense. *United States v. Garcia*, 919 F.3d 489, 502 (7th Cir. 2019) (citation, internal quotation marks and parenthetical omitted). For these reasons, the Court finds Lewin's testimony inadmissible.

**Donald Clarke**

Defendant provides the following qualifications for his second expert, Professor Donald Clarke, who will be called to testify in support of Defendant's position that he "had no rational ability to refuse to answer the undercover agent's questions" based on Chinese laws and "the practical way [the People's Republic of China ("PRC")] exercises power." The information is taken from a declaration by Clarke, (Clarke Decl., Dkt. # 192-4), his curriculum vitae, (Dkt. # 192-4, at Pages 7 to 28), and Defendant's response to the government's motion to exclude, (Def.'s Resp., Dkt. # 291, at 2-3).[2] Clarke is currently a Professor of Law and the David A. Weaver Research Professor at the George Washington University Law School. He obtained his Bachelor of Arts degree *cum laude* in 1977 from Princeton University. From 1977 to 1979, Clarke attended Beijing University and Nanjing University as part of an academic exchange program. In 1983, Clarke earned a graduate degree in the Government and Politics of China from the University of London's School of Oriental and African Studies. He received his Juris Doctor degree *cum laude* from Harvard Law School in 1987. While at Harvard, Clarke served as a member of the Harvard Law Review editorial board as well as the Harvard International Law Journal. As a lecturer, Clarke taught a class on the commercial law of the Far East for the University of London School of Oriental and African Studies, Department of Law, from September 1985 until July 1988. He was a professor at the University of Washington School of Law from 1988 to 2004, and an attorney with Paul, Weiss, Rifkind, Wharton & Garrison ("Paul, Weiss") in New York from September 1995 to August 1998. While at Paul, Weiss, Clarke visited China and Hong Kong approximately twice a year for work related to China. He has also served as a visiting professor at the University of California at Los Angeles School of Law, Duke Law School, and New York University Law School.

---

[2] Clarke's curriculum vitae is lengthy; only portions of it are recited here.

Clarke has served as adviser or consultant on Chinese law matters to several bodies, including the Asian Development Bank, the Agency for International Development, and the World Bank's Financial Sector Reform and Strengthening Initiative. He has testified on aspects of the Chinese legal system before the Congressional-Executive Commission on China and the United States-China Economic and Security Review Commission. In 2005, he was appointed to the Academic Advisory Group to the US-China Working Group of the United States Congress.

Clarke's curriculum vitae shows that, throughout his professional life, he has written extensively on topics related to the Chinese state and law, including publishing a book in 2008 entitled *China's Legal System: New Developments, New Challenges*. He recently authored an article entitled *Order and Law in China*, which is expected to be published in the University of Illinois Law Review this year. He is fluent in Mandarin.

According to Defendant, Clarke will testify as follows[3]:

- Chinese law, specifically the National Intelligence Law, obliges Chinese citizens to cooperate with intelligence work. This obligation is not subject to territorial boundaries.
- Obligations under the National Intelligence Law do not come with an accompanying enforcement mechanism, and Clarke is not aware of any law or regulation in which the failure to cooperate in intelligence collection is defined as a punishable offense. Nevertheless, it is his opinion that there is no question that the obligation to cooperate under the National Intelligence Law is enforceable as a practical matter by the Chinese state.
- Despite the reality of actual enforceability, the law does not spell out a specific sanctioning mechanism for violations of this obligation to cooperate with intelligence work.
- Although no specific sanctioning mechanism exists, the Chinese state can in practice enforce the obligation to cooperate through a variety of explicit and implicit threats, including by threatening relatives. Because the Chinese state is not constrained by Chinese law, those threats can be carried out even if they lack a legal basis, and citizens know this.

(Def.'s Resp., Dkt. # 291, at 2.)

Defendant states that Professor Clarke is also expected to opine that:

- The key question is not what Chinese law says about the ability of the Chinese government to require citizens to provide information and assist in intelligence gathering, but what the Chinese government can actually require.

---

[3] While the Court has paraphrased Defendant's description of Clarke's opinions, it believes it has accurately captured the essence of his opinions.

- The Chinese government is not meaningfully constrained by Chinese law, particularly in matters related to national security.  Chinese law might appear to provide a basis for resisting government demands, but that basis is illusory and unenforceable in the Chinese legal system.
- The Chinese political system recognizes no limits on government power.
- The notion that Chinese citizens could decline requests by Chinese security agencies and suffer no consequences is "fanciful."

(*Id.*, at 4-6.)  Further, according to Clarke, the Chinese state would not consider the prospect of punishment under foreign law a valid reason for refusing a demand to cooperate.  (*Id.*)

According to Defendant, his "argument is going to be that the same circumstances that make the statements involuntary, i.e., compelled, make them untruthful[,] and statements that the jury should disregard." (Def.'s Resp., Dkt. # 294, at 13.) Pointing to *United States v. Mamah*, 332 F.3d 475 (7th Cir. 2003), the government argues that Clarke's testimony is inadmissible in this regard. In *Mamah*, a Ghanian immigrant charged with possession with intent to distribute heroin sought to introduce at trial the testimony of an expert who would testify that "behaviors adopted by Ghanaians in response to living under a military regime could lead them to make false confessions when confronted by law enforcement authorities." *Id.* at 476.  The district court concluded the testimony was unreliable and thus inadmissible because the expert was not "a clinical psychologist qualified to assess [the defendant's] susceptibility to the interrogation techniques used by the FBI"; the defendant "had been living in the United States since 1984, [which was] more than enough time to have learned the difference between Ghanaian and American law-enforcement practices"; and "since [the defendant] claimed that he had been detained and beaten while still living in Ghana, the court viewed the relevance of [the expert's] testimony as dependent upon similarities between this incident and the FBI agents' interview of [the defendant]," which did not exist. *Id.* at 476-77.  On appeal, the defendant claimed that the expert's testimony was improperly excluded.

In addressing the defendant's contention, the Seventh Circuit stated that "[i]t is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *Id.* at 478.  In affirming the district court's exclusion of the expert's testimony, the *Mamah* court found that "the problem [with the expert's testimony] [was] the absence of an empirical link between [her] research and the opinion that [the defendant] likely gave a false confession." *Id.*  Because the expert witness's "expertise is limited to the cultural practices of Ghanaian nationals living in Ghana; she has no basis for extrapolating this conclusion to [the defendant], a Ghanaian expatriot." *Id.*  In other words, the expert's "testimony may have been useful in answering questions about how a repressive military regime shapes Ghanaian behavioral patterns, but those questions were not pertinent here because the interrogation in this case did not occur in Ghana and [the defendant] has not lived in Ghana since 1984." *Id.*

According to the government, Clarke's testimony must be excluded because he points to no facts or data linking the culture of the Chinese government and the practices of the MSS to the purported "false" testimony of Defendant. (Gov't's Sur-Reply, Dkt. # 298, at 9) ("Taken to its logical conclusion, Professor Clarke's opinion would mean that any statement made by any

Chinese citizen . . . to any government official would be involuntary."). Defendant responds that unlike the expert in *Mamah*, "Professor Clarke is not a mere sociologist who will be asked to volunteer opinions about Chinese culture generally; rather, he will be asked questions regarding the obligations and requirements of Chinese citizens to answer questions and cooperate with national intelligence authorities when requested to do so, which is a subject comfortably within his area of expertise." (Def.'s Resp., Dkt. # 291, at 15.) Defendant also asserts that unlike in *Mamah*, where the Seventh Circuit noted that the United States did not utilize Ghanian tactics during the interrogation of the defendant, here "the government intentionally assumed and utilized the imprimatur of the PRC government for [the United States'] 'false flag' 'role player' operation." (*Id.* at 15-16.)

Defendant's position, however, continues to ignore that Clarke fails to offer any tie between Clarke's opinions on Chinese citizens' purported obligations to answer questions by intelligence officials and whether *Defendant* made false or unreliable statements. Notably, Defendant's disclosure regarding Clarke's proposed testimony does not include an opinion that Defendant made a false statement, and Clarke specifically states in his declaration that he "express[es] no opinion on whether, or to what degree, any compulsion existed in this particular case." The probative value of Defendant's expert in this regard is questionable. As the government points out, there will be no testimony as to how these generalized concepts of Chinese laws and culture requiring citizens to aid their intelligence agencies affected Defendant. Defendant points to no factual base of reference in the expert's report from which he (or a trier of fact) can draw a reasonable conclusion as to how Chinese law or the FBI undercover agent's use of certain words or phrases would have affected Defendant. While the jury is allowed to draw reasonable inferences from the evidence, it is not allowed to speculate. Clarke's opinions are based solely on his conclusions about the general effect of Chinese laws on a large and diverse population. From this generality, and this alone, Defendant will ask the jury to conclude that he was intimidated and therefore fabricated information about his attempts to obtain confidential information on behalf of the PRC. There are far too many inferences and unknown variables for such a conclusion to be sound.

Furthermore, the evidence proffered by the government makes clear that Defendant is not an average Chinese citizen. He holds a bachelor's degree in engineering from Beihang University of Aeronautics and Astronautics and a master's degree in electrical engineering from the Illinois Institute of Technology. He is sufficiently proficient in English to have studied for an advanced degree in the United States, attended basic military training here, and been admitted to the United States Army.[4] The government will also present evidence that Defendant carried an unsigned card pledging his loyalty to the MSS and participated in dinners and meetings and exchanged messages with more than one MSS agent. The government proffers evidence that Defendant voluntarily started his relationship with the MSS while still studying in China, and that he received money from the MSS for his efforts on its behalf, a portion of which he sent to his parents, who supported his endeavors and reminded him to be careful. According to the government, Defendant agreed with MSS officers when they provided him with a false narrative for his girlfriend so that she would not learn of his relationship with the MSS. These pieces of evidence strongly imply that Defendant voluntarily entered into a confidential relationship with the MSS.

---

[4] The government states Defendant is fluent in English.

Clarke's opinions do not address the effect of Chinese intelligence laws on Chinese individuals who are already working for the MSS and have agreed to be Chinese sleeper agents like Defendant is alleged to be. Clarke does not address how Chinese intelligence agencies approach an individual who has already committed to actively supplying them with intelligence while living in the United States and whose potential to provide future intelligence as a member of the United States Army and future United States citizen is significant. There is no indication that Clarke would be qualified to give such opinions. His opinions regarding the general effect of Chinese law, therefore, lack a sufficient connection to the facts and circumstances of this case. Because Defendant points to no connection between Clarke's opinions and Defendant, in particular, Clarke's testimony is inadmissible.

There is an additional concern. The government argues that Clarke's testimony should be excluded as unduly prejudicial under Rule 403 because the jury could "be led to believe wrongly that the defendant is asserting a sort of coercion defense—even though he is not and the jury will not receive an instruction on the parameters of the defense." (Gov't's Mot. Exclude, Dkt. # 289, at 11.) Defendant contends that the government's claims of prejudice are speculative and unfounded given that the jury will be instructed not to speculate and that it should base its decision only on the evidence presented in court, may make reasonable inferences based on the testimony, and must find Defendant guilty of the offenses for which all elements have been proven beyond a reasonable doubt. (Def.'s Resp., Dkt. # 291, at 17.) Defendant asserts that the government may propose an instruction that the jury may consider Clarke's testimony only as to the voluntariness of Defendant's alleged statement and not to negate any element of the offense. Yet in his sur-reply, Defendant states he is going to argue that he "had no intent, interest, or willingness" to act as an "insider and . . . willing participant," and that he only made the statements at issue to the undercover agent because he was "scared" and "threatened." (Def.'s Sur-Reply, Dkt. # 294, at 13.) To the extent Defendant seeks to use Clarke to bolster his argument to the jury regarding his intent, beliefs, or emotions, such testimony is undoubtedly unduly prejudicial for two reasons: it not only substitutes a law professor's testimony for that of Defendant, but it in turn also deprives the government of an opportunity to cross-examine Defendant (who may elect not to testify) about his "intent, interest, or willingness" and the reasons he felt "scared" and "threatened." Moreover, by offering expert testimony to imply Defendant's state of mind at the time he gave incriminating statements, Defendant seeks to bootstrap a coercion defense from evidence ostensibly offered to prove the "involuntariness" of his incriminating statements, and to do so in a case in which the coercion defense has not been raised. Such an argument is clearly unduly prejudicial.

For these reasons, the Court grants the government's motion to exclude the testimony of Defendant's experts.

**Date:** August 3, 2022

*Ronald A. Guzmán*

**Ronald A. Guzmán**
**United States District Judge**